# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| STRIPE PAYMENTS AUSTRALIA PTY LTD,<br><br>Plaintiff,<br><br>- against -<br><br>777 PARTNERS, LLC, SUTTON SPECIALTY INSURANCE COMPANY, and SUTTON NATIONAL INSURANCE COMPANY,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Stripe Payments Australia Pty Ltd ("**Stripe**"), by and through its undersigned attorneys, for its Complaint against Defendants 777 Partners, LLC ("**777**"), Sutton Specialty Insurance Company ("**Sutton Specialty**"), and Sutton National Insurance Company ("**Sutton National**") (Sutton Specialty and Sutton National are referred to collectively as "**Sutton**"), states and alleges as follows:

## Nature of the Action

1. By this action, Stripe seeks to enforce a guaranty dated August 4, 2023 (the "**Guaranty**") made by subsidiaries of 777, Sutton, which served as the basis and inducement for Stripe's agreement to process credit card transactions for another subsidiary of 777, non-party Bonza Aviation Pty Ltd ("**Bonza**") – or in the alternative, to untangle the web of lies and deceit by 777 and one of its executives, non-party John Jeffrey ("**Jeffrey**"), that led to the provision of the Guaranty, purportedly without Sutton's knowledge.

2. When Stripe agrees to process credit card transactions, it assumes credit risk that can result from credit card users charging back disputed amounts, which Stripe must then collect from its customer, in this case, Bonza. To mitigate that risk, Stripe required a guaranty of Bonza's

4867-3438-5095v.13 0095740-000189

payment obligations from a solvent entity for Bonza to open a Stripe account. 777 and Jeffrey orchestrated for this guaranty to be provided by Sutton, asserting that Sutton knew and approved of making the guaranty, and provided financial information to Stripe to support Sutton's creditworthiness. Ultimately, Jeffrey executed the Guaranty on behalf of Sutton, claiming authority to do so.

3. Bonza suffered a complete financial collapse in 2024 and entered into voluntary administration in Australia, similar to U.S. bankruptcy proceedings. Bonza's collapse resulted in stranded travelers initiating chargebacks for airline ticket purchases for flights that would never occur on Bonza's planes. Accordingly, Stripe demanded Sutton, as guarantor, perform Bonza's obligations under the payment processing agreement, specifically, to fund a contractual reserve fund to pay the mounting chargebacks.

4. Stripe had no reason to believe there was any dispute about the validity of the Guaranty. In response to Stripe's demand in the summer of 2024, however, Sutton shockingly claimed it had no knowledge of the Guaranty, that Jeffrey was not authorized to sign it, and disclaimed any obligations under the Guaranty.

5. In 2024, a number of deceptions by 777 have been alleged or exposed. 777 was accused in a recent lawsuit of pledging over $350 million in assets as collateral for a credit agreement, even though 777 knew that the assets either did not exist or were not under its ownership.[1] In a different complaint, 777 was accused of fraudulently transferring Sutton in a restructuring that was intended to shield assets from creditors. Utah and South Carolina regulators

---

[1] https://www.nytimes.com/2024/05/04/world/europe/everton-777-partners-lawsuit.html (last accessed Feb. 24, 2025).

forced insurers to cut their exposure to 777 as part of an intention "to protect retirees, widows and orphans relying on annuities and other products from the insurers."[2]

6. Perhaps to avoid further public dispute, in about September 2024, 777 entered into a certain Forbearance Agreement whereby, without admitting any liability, it agreed to make periodic payments to Stripe that were due under the Guaranty, in exchange for which Stripe agreed not to bring any claims. While 777 made payments for the first few months, it ceased making the payments required by the Forbearance Agreement and is now in default of its obligations under the Forbearance Agreement, thus permitting Stripe to exercise any and all rights it has under the Guaranty or otherwise.

7. Stripe now brings this action to enforce the Guaranty, or, alternatively, for damages resulting from the fraudulent actions of 777.

**The Parties**

8. Stripe is a proprietary limited company, a type of stock corporation, organized under the laws of Australia and having its principal place of business in Melbourne, Australia.

9. 777 is a limited liability company organized under the laws of the State of Delaware and having its principal place of business in Miami, Florida. Upon information and belief, 777 has one member, SuttonPark Acquisition LLC, which is organized under the laws of Delaware and has its principal place of business in Florida. SuttonPark Acquisition LLC has two members, JARM Capital LLC and MTCP LLC, both of which are organized under the laws of Delaware and have their principal places of business in Florida. The sole member of JARM Capital LLC is Josh Wander, and the sole member of MTCP LLC is Steven Pasko. Both Mr. Wander and Mr. Pasko are residents of the State of Florida.

---

[2] https://www.ft.com/content/a225cb7d-ccdd-495d-b7f1-a8124129b8bf (last accessed Feb. 24, 2025).

10. Sutton Specialty is an insurance company organized under the laws of the State of Oklahoma and having its principal place of business in Dania Beach, Florida.

11. Sutton National is an insurance company organized under the laws of the State of Oklahoma and having its principal place of business in Dania Beach, Florida.

12. Upon information and belief, the Sutton Specialty and Sutton National were, until recently, wholly or partially owned subsidiaries of 777.

13. Non-party Jeffrey is an individual who is a subject and resident of the United Kingdom.

14. Non-party Bonza was an Australian low-cost airline that is now in administration, a type of bankruptcy proceeding under the laws of Australia.

15. Upon information and belief, Bonza was, until recently, a wholly or partially owned subsidiary of 777.

## Jurisdiction and Venue

16. This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship and an amount in controversy over $75,000, exclusive of interest and costs. Stripe is a citizen of Australia for diversity purposes. 777, through its ultimate membership, is a citizen of Delaware and Florida for purposes of diversity jurisdiction. Sutton is a citizen of Oklahoma and Florida for diversity purposes. Accordingly, complete diversity of citizenship exists.

17. This Court has personal jurisdiction over 777 because it maintains its offices and headquarters in Miami, Florida, and therefore is present within this District and is doing business within it.

18. This Court has personal jurisdiction over Sutton because it maintains its offices and headquarters in Dania Beach, Florida, and therefore is present within this District and is doing business within it.

19. Venue is proper in the Southern District of Florida, Miami Division, because Sutton and 777 can be found in this District pursuant to 28 U.S.C. § 1391(b).

## Factual Background

A. **The Stripe Services Agreement Between Stripe and Bonza**

20. Stripe provides certain payment processing, data, technology and analytics services, and other business services through its Stripe Services Agreement.

21. According to Bonza's website, which is no longer active, "Bonza is Australia's new and only independent, low cost airline servicing domestic and regional routes in Australia."

22. In 2023, Stripe and Bonza began discussions for Stripe to provide certain payment processing services to Bonza, so that Bonza could accept payments from customers using Stripe's technology. Eventually, the parties signed the Stripe Services Agreement (the "**Stripe Services Agreement**") on August 1, 2023. The Agreement is attached to this Complaint as **Exhibit A**.

23. Section 4.4 of the Stripe Services Agreement states that "[i]f Stripe reasonably determines that a Triggering Event has occurred, Stripe may do any or all of the following: … (c) establish, fund and use a Reserve."

24. Under the Stripe Services Agreement, one way that a Triggering Event occurs is if Bonza "experiences a material deterioration of its business or financial condition."

25. Section 4.5 of the Agreement permits Stripe to fund the reserve from three places: (1) "funds [Bonza] provides upon Stripe's request;" (2) "amounts Stripe owes to [Bonza] for Transactions that [Bonza] accepts through the Stripe Payments Services; or" (3) "debiting the [Bonza] Bank Account."

B. **The Corporate Guaranty Between Stripe and Sutton**

26. Stripe would not agree to enter into the Stripe Services Agreement without security against possible risk of loss that could result from customer chargebacks.

27. Chargebacks occur when credit card users dispute payments made by credit card. In such instances, funds are refunded to the users during the period of dispute. Stripe seeks to avoid risk of dispute between credit card users and its counterparties, and, therefore, requires that its counterparties provide some means to protect against that risk.

28. Initially, Stripe requested that Bonza place money in reserve against the risk of chargebacks, but Bonza did not want to provide a reserve. Because of this, the parties began exploring alternative forms of security interests.

29. From the beginning of the negotiations concerning the Stripe Services Agreement, Stripe interacted with representatives of 777, who purported to act on Bonza's behalf. These representatives included Iman Baigmohamed, an investment associate for 777, Manish Raniga, who worked as the Chief Executive Officer for 777's airline investments, and Damien Alfalla, the Chief Financial Officer of 777.

30. Therefore, it was no surprise to Stripe when it was referred to another employee of 777, Jeffrey, identified as Managing Director and Head of Europe at 777, to locate a potential guarantor of Bonza's obligations to Stripe under the Stripe Services Agreement.

31. Jeffrey suggested that another one of 777's subsidiaries could enter into a corporate guaranty with Stripe in order to provide financial security in exchange for Stripe's services. Stripe and Jeffrey discussed multiple subsidiaries that could potentially sign the guaranty. Eventually, Jeffrey advised Stripe that Sutton would provide the guaranty as it was a stable company, had a sufficient amount of money available to it, and was located in the United States.

32. Jeffrey told Stripe that he was in charge of 777's insurance portfolio, which included Sutton, and that he had authority to enter into the Guaranty on Sutton's behalf.

33. Jeffrey provided financial statements and information to show Sutton's financial condition in order to provide Stripe assurances that it was well-capitalized.

34. During the drafting of the guaranty, Mr. Raniga told Stripe that Mr. Alfalla was reviewing the guaranty, and Ms. Baigmohamed told Stripe that she was having Sutton review the guaranty for approval. Although Stripe originally drafted the corporate guaranty to be unlimited, Jeffrey purportedly spoke with representatives of Sutton and negotiated on its behalf, requesting that the guaranty be limited to $14 million Australian Dollars. These representations by 777's employees led Stripe to believe that Sutton was aware of and consented to the guaranty.

35. After drafting the corporate guaranty with Sutton as the guarantor, Stripe was told by 777 and Jeffrey that Jeffrey could sign the guaranty on behalf of Sutton and that he had the power and authority to do so.

36. Jeffrey executed the Guaranty on August 4, 2023. A copy of the Guaranty is attached to this Complaint as **Exhibit B**.

37. That a representative of 777 signed the Guaranty on behalf of Sutton was consistent with previous practices where 777 had signed agreements on behalf of its subsidiaries. For instance, Stripe had previously entered into a professional services agreement with Bonza that 777 signed on Bonza's behalf.

38. The final version of the Guaranty stated that Sutton agreed to guarantee Bonza's performance under the Stripe Services Agreement:

> [Sutton] absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by [Bonza] under or relating to the [Stripe Services Agreement], plus all costs, expenses and fees (including the reasonable fees and expenses of [Stripe's] counsel) in any way relating to the enforcement or protection of [Stripe's] rights hereunder (collectively, the "**Obligations**"). Subject to the terms of this Guaranty, Guarantor absolutely,

unconditionally and irrevocably agrees during the Term, as an independent and primary obligation, to indemnify and keep indemnified Stripe for all direct losses (including loss of profit), liabilities, costs and expenses incurred as a result of: (i) the failure of [Bonza] to perform or discharge its obligations under the Underlying Agreement, and (ii) any obligation guaranteed by [Sutton] becoming void or unenforceable against [Bonza], provided that [Sutton's] liability under this indemnity shall be no greater than [Bonza's] liability under the [Stripe Services Agreement]. The amount payable by [Sutton] in respect of such losses, liabilities, costs or expenses shall: (i) subject to the following sentence, be equal to the amount which Stripe would otherwise have been entitled to recover from [Bonza] if the guaranteed obligation had not been or become void or unenforceable; and (ii) not exceed a total of AUD $14,000,000.

C.  **Bonza's Financial Struggles Trigger the Guaranty**

39. On April 29, 2024, Bonza suspended its airline services after AIP Capital, the lessor of its aircraft, terminated the aircraft leases. On information and belief, the termination of the leases occurred nearly two weeks after AIP Capital sent default notices to Bonza.

40. That same day, Bonza cancelled all of its flights, which left thousands of passengers stranded throughout Australia. Bonza sent a message to its customers directing anyone who wanted a refund for their cancelled flight to complete an online form.

41. At or around that time, Bonza reportedly suspended work for more than 300 members of its staff, without pay, and advised them that they would not receive wages owed to them for the month of April.

42. On or about April 29, 2024, Stripe exercised its right under the Stripe Services Agreement to impose a Reserve on Bonza's Stripe account. Stripe sent Bonza written notice that a fixed Reserve had been placed on Bonza's Stripe account with a target reserve amount of AUD $6,000,000 due to (a) forward trading (i.e., payments for future flights that would be unfulfilled) being approximately AUD $20,000,000, and (b) the existence of approximately AUD $2,600,000 of charges via web checkout that did not have their fulfilment date provided to Stripe.

43. On or about April 30, 2024, Bonza entered into voluntary administration, a form of bankruptcy or restructuring proceeding in Australia, and also failed and refused to fund the Reserve through any of the three methods described in the Stripe Services Agreement.

44. By letter dated May 13, 2024, Stripe made due demand on the Guaranty, requiring Sutton to immediately deliver payment of funds to cover the obligations owed by Bonza to Stripe. The demand letter explained that as Bonza could not fund the Reserve, the funds required to accumulate AUD $6,000,000 in the Reserve represented an Obligation as defined in the Guaranty. A true and correct copy of the May 13, 2024, letter to Sutton is attached to this Complaint as **Exhibit C**.

45. In addition to other demands, Stripe demanded that Sutton immediately, and no later than May 14, 2024, wire funds to Stripe to cover the full amount of the Reserve and commit to wire further funds to Stripe promptly upon Stripe's future request, to maintain the Reserve at AUD $6,000,000 or to satisfy any other due but unpaid amount from Bonza to Stripe, on the condition that the total funds transferred from Sutton to Stripe would not exceed AUD $14,000,000.

**D.  Sutton Refuses To Perform Its Obligations under the Guaranty**

46. To Stripe's complete surprise, Simon Gildener, general counsel for Sutton, responded to Stripe's demand by email dated May 14, 2024 claiming that Sutton had no knowledge of the Guaranty and asking Stripe to send Sutton a copy.

47. Stripe promptly sent Sutton a copy of the Guaranty as well as extracts of the Stripe Services Agreement between Bonza and Stripe. Sutton's counsel responded to Stripe that he would review the documents and revert.

48. Sutton failed and refused to engage in any further discussions about the Guaranty, necessitating Stripe's counsel to send a new demand by letter dated May 20, 2024. The letter again

explained that Bonza failed to fund the Reserve as required by the Stripe Services Agreement, and that therefore Stripe demanded that Sutton honor its obligations under the Guaranty and perform on behalf of Bonza by funding the Reserve required by the Stripe Services Agreement. The letter asked Sutton to confirm in writing that it would comply with Stripe's demand as set forth in the letter dated May 13, 2024 and that, if Sutton failed to do so, Stripe would take all steps appropriate to enforce its rights under the Guaranty.

49. Sutton responded, through Mr. Gildener, by letter dated May 22, 2024. Sutton stated, among other things, that it had no knowledge of the Guaranty prior to May 13, 2024 and that Jeffrey was never authorized to issue the Guaranty on Sutton's behalf. It disclaimed any liability under the Guaranty and characterized it as unenforceable.

50. As of the date of this Complaint, credit card customers have made over $2 million USD in chargebacks relating to unfulfilled services by Bonza, of which about $500,000 remains unreimbursed from any source. Because customer chargebacks cannot be made until such time as scheduled plane service has passed, chargebacks continue to accrue.

E. **The Parties Enter Into a Forbearance Agreement, which 777 Later Breaches**

51. On September 6, 2024, Stripe and 777 entered into a Forbearance Agreement whereby Stripe agreed to temporarily forbear from taking action to enforce the Guaranty or related claims. In exchange, 777 agreed to tender $500,000 (USD) to Stripe in addition to tendering $300,000 (USD) to Stripe on the 15th of each month until receipt of the full amount of chargebacks plus an additional $2,000,000 to be held in reserve had been paid.

52. On around September 19, 2024, Stripe and Sutton entered into a certain Standstill and Tolling Agreement whereby they each agreed, without admitting any liability, not to assert any claims against each other and that the statute of limitations or other periods of repose were tolled.

53. On or around September 10, 2024, Stripe received a payment of $500,000 (USD) from 777.

54. On or around October 15, 2024, Stripe received a payment of $300,000 (USD) from 777.

55. On or around November 15, 2024, Stripe received a payment of $300,000 (USD) from 777.

56. Stripe did not receive a payment from 777 on December 15, 2024, as required by the Forbearance Agreement. On or around December 23, 2024, Stripe received a payment of $300,000 (USD) from 777.

57. Stripe did not receive a payment from 777 on January 15, 2025, as required by the Forbearance Agreement. After extended negotiations with 777, Stripe received a payment of $300,000 (USD) from 777 on February 26, 2025.

58. On or about February 19, 2025, Stripe provided notice of termination of the Standstill and Tolling Agreement to Sutton, by reason of which the period of standing and tolling came to an end.

59. By reason of 777's failure to make timely payment to Stripe under the Forbearance Agreement, 777 is in default thereunder and the period of forbearance terminated and came to an end without the need of any further notice or action by Stripe.

60. As of the date of this Complaint, Stripe has not received any additional payments from 777.

**F.      777 is Exposed as a House of Cards**

61. Recently, 777 has come under scrutiny for its financial practices after there have been increasing reports of 777 not paying its debts.

62. For example, in late 2021, 777 started to purchase sports teams in Europe and Latin America. One of these purchases was the purchase of Everton FC, an English soccer club, for almost $700 million in September 2023.

63. 777's deal to buy the Everton Football Club, however, collapsed after the sale and purchase agreement expired. This collapse occurred just weeks after 777 denied accusations of fraud and engaged restructuring experts to assist with "operational challenges."[3] The team has since been acquired by another investor.

64. 777 Partners also lost control of a Belgian soccer club and a Brazilian soccer club, and the British Basketball League, of which it was a significant investor, has lost its sporting license, all as a result of financial mismanagement.

65. Another article reported that 777 and a related company, 600 Partners, lost nearly $172 million (USD) in the first half of 2021, and nearly $426 million (USD) in the first half of 2022.

66. The Department of Justice is reportedly investigating 777 for money laundering.[4]

67. Finally, another lawsuit filed in March 2024 alleged that 777 had fraudulently transferred Sutton to one of its co-founders, Steven Pasko. Specifically, that complaint alleged that 777 underwent an internal restructuring to hinder and delay payments to its creditors, and that the restructuring included transferring Sutton Specialty Insurance Company and Sutton National Insurance Company from 777 to Steven Pasko. According to the complaint, 777's restructuring caused a rating agency, AM Best, to place Sutton Specialty Insurance Company and Sutton National Insurance Company under review, with negative implications. The complaint alleges

---

[3] https://www.ft.com/content/b128819b-5960-408c-b87c-8eac8b968e1a (last accessed Aug. 30, 2024).
[4] https://www.semafor.com/article/11/30/2023/feds-probe-sports-investor-777-over-money-flows (last accessed June 11, 2024).

that 777 did not receive any consideration for the transfer and that the transfer was intended to shield 777's assets and to hinder its creditors from recovering on 777's increasing debts.

## COUNT ONE
## BREACH OF GUARANTY
### (Against Defendant Sutton)

68. Stripe incorporates by reference the allegations of Paragraphs 1-56.

69. The Stripe Services Agreement is a valid, binding, and subsisting agreement between Stripe and Bonza.

70. Stripe has performed all of its obligations under the Stripe Services Agreement.

71. In order to induce Stripe to enter into the Stripe Services Agreement, and as a condition therefore, Sutton provided a Guaranty dated as of August 4, 2023, which absolutely and unconditionally guaranteed all of Bonza's performance obligations under the Stripe Services Agreement.

72. The Guaranty is a valid, binding, and subsisting agreement between Stripe and Sutton.

73. Bonza has failed and refused to perform its obligations pursuant to the Stripe Services Agreement, including without limitation to establish and fund a reserve pursuant to Section 4.4 of the Stripe Services Agreement.

74. By reason of Bonza's breach, Sutton is obligated to honor and perform under the Guaranty.

75. While not required by the Guaranty, Stripe has made due demand on Sutton under the Guaranty.

76. Sutton has failed to honor its obligations pursuant to the Guaranty.

77. By reason of the foregoing, Stripe has been damaged by an amount to be determined at trial, but in no event less than $694,067.67.

## COUNT TWO
## BREACH OF GUARANTY
**(Against Defendant 777)**

78. Stripe incorporates by reference the allegations of Paragraphs 1-56.

79. The Stripe Services Agreement is a valid, binding, and subsisting agreement between Stripe and Bonza.

80. Stripe has performed all of its obligations under the Stripe Services Agreement.

81. In order to induce Stripe to enter into the Stripe Services Agreement, and as a condition therefore, Jeffrey, as 777's Managing Director and Head of Europe and the person in charge of 777's insurance profile, executed a Guaranty dated as of August 4, 2023, which absolutely and unconditionally guaranteed all of Bonza's performance obligations under the Stripe Services Agreement.

82. 777 had knowledge that Jeffrey was executing the Guaranty.

83. 777 had knowledge that provision of the Guaranty was integral to and part of the same transaction as the Stripe Services Agreement.

84. Jeffrey executed the Guaranty pursuant to and as a part of his duties to 777.

85. 777's knowledge concerning the circumstances of the execution of the Stripe Services Agreement and the Guaranty are imputed to Jeffrey, and vice versa.

86. If Sutton is not bound to the Guaranty, then, in the alternative, 777 is bound to the Guaranty.

87. In that event, the Guaranty is a valid, binding, and subsisting agreement between Stripe and 777.

88. Bonza has failed and refused to perform its obligations pursuant to the Stripe Services Agreement.

89. By reason of Bonza's breach, 777 is obligated under the Guaranty to honor and perform all of Bonza's obligations under the Stripe Services Agreement, including without limitation its obligation to establish and fund a reserve pursuant to Section 4.4 of the Stripe Services Agreement.

90. 777 has failed to honor its obligations pursuant to the Guaranty.

91. By reason of the foregoing, Stripe has been damaged by an amount to be determined at trial, but in no event less than $694,067.67.

## COUNT THREE
### FRAUDULENT MISREPRESENTATION
**(Against Defendant 777)**

92. Stripe incorporates by reference the allegations of Paragraphs 1-56.

93. In 2023, Jeffrey, acting on behalf of 777, and other agents and representatives of 777, including Iman Baigmohamed, Manish Raniga, and Damien Alfalla, intentionally made material misrepresentations to Stripe that induced Stripe to enter into the Stripe Services Agreement, including that:

    a. 777 would identify a subsidiary or affiliate that would make a guaranty of Bonza's obligations under the Stripe Services Agreement;

    b. Sutton was ready, willing, and able to make such a Guaranty;

    c. Sutton was a well-capitalized company as shown in financial documents and information provided to Stripe;

    d. They had spoken to Sutton regarding the Guaranty and indicated that Sutton had agreed to the Guaranty;

    e. Sutton requested that the Guaranty be limited to $14 million; and

    f. Jeffrey had the power and authority to execute the Guaranty on behalf of Sutton.

94. At the time 777 representatives made these statements, each of them knew they were untrue.

95. Representatives of 777 intended for Stripe to rely on the misrepresentations made to Stripe.

96. Stripe reasonably relied on the misrepresentations made by 777 based on its prior dealings with 777, the documents and information that Jeffrey and Sutton provided, prior agreements that 777 entered into on behalf of its subsidiary company, and the parties' course of dealing and course of performance.

97. By reason of the foregoing, Stripe has been damaged by an amount to be determined at trial, but in no event less than $694,067.67.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION
### (Against Defendant 777)

98. Stripe incorporates by reference the allegations of Paragraphs 1-56.

99. Jeffrey, acting on behalf of 777, and other agents and representatives of 777, including Iman Baigmohamed and Manish Raniga, and Damien Alfalla, negligently made material misrepresentations to Stripe that induced Stripe to enter into the Stripe Services Agreement, including that:

   a. 777 would identify a subsidiary or affiliate that would guaranty Bonza's obligations under the Stripe Services Agreement;

   b. Sutton was ready, willing, and able to make the Guaranty;

   c. Sutton was a well-capitalized company as shown in financial documents and information provided to Stripe;

   d. They had spoken to Sutton regarding the Guaranty and that Sutton had agreed to the Guaranty;

    e. Sutton requested that the Guaranty be limited to $14 million; and

    f. Jeffrey had the power and authority to execute the Guaranty on behalf of Sutton.

100. At the time 777 representatives made these statements, they should have known that the representations were untrue.

101. Representatives of 777 intended for Stripe to rely on the misrepresentations made to Stripe.

102. Stripe reasonably relied on the misrepresentations made by 777 based on its prior dealings with 777, the documents and information that Jeffrey and Sutton provided, prior agreements that 777 entered into on behalf of its subsidiary company, and the parties' course of dealing and course of performance.

103. By reason of the foregoing, Stripe has been damaged by an amount to be determined at trial, but in no event less than $694,067.67.

## COUNT FIVE
## UNJUST ENRICHMENT
### (Against Defendant 777)

104. Stripe incorporates by reference the allegations of Paragraphs 1-56.

105. Stripe conferred a benefit on 777 by agreeing to provide payment processing services to 777's subsidiary, Bonza.

106. 777 voluntarily accepted and retained the benefit of Stripe's providing payment processing services to Bonza, its subsidiary.

107. Under these circumstances, it would be inequitable for Jeffrey and 777 to retain the benefits of the Stripe Services Agreement and the Guaranty.

108. By reason of the foregoing, Stripe has been damaged by an amount to be determined at trial, but in no event less than $694,067.67.

## COUNT SIX
## PROMISSORY ESTOPPEL
### (Against All Defendants)

109. Stripe incorporates by reference the allegations of Paragraphs 1-56.

110. Sutton and 777 promised Stripe that Sutton would perform its obligations as stated in the parties' Guaranty.

111. Sutton and 777 should reasonably have expected that Stripe would have relied on that promise by agreeing to enter into the Guaranty and by providing payment processing services to Bonza.

112. Stripe did, in fact, rely on the promise made by Sutton and 777 by providing payment processing services to Bonza.

113. Such reliance was detrimental to Stripe inasmuch as it is now suffering losses as a result of customer chargebacks related to Bonza's non-performance.

114. Injustice to Stripe can only be avoided by enforcing the Guaranty against each of Sutton and 777.

## COUNT SEVEN
## DECLARATORY JUDGMENT
### (Against All Defendants)

115. Stripe incorporates by reference the allegations of Paragraphs 1-56.

116. Stripe seeks a declaratory judgment stating that Sutton and 777, or either of them, are liable for the obligations in the Guaranty.

117. Stripe contends that one or both of Sutton or 777 are bound by the obligations contained in the Guaranty.

118. Sutton and 777 contend that neither are bound by the obligations contained in the Guaranty.

119. A bona fide dispute exists between the parties as to whether the Guaranty is enforceable against Sutton and/or 777.

120. A justiciable controversy exists.

121. As such, there is a bona fide, actual, present need for the declaration.

## PRAYER FOR RELIEF

**WHEREFORE**, Stripe respectfully requests that the Court enter:

a) Judgment in Stripe's favor and against Sutton for sums owing to Stripe for Sutton's breach of guaranty;

b) In the alternative, judgment in Stripe's favor and against 777 for sums owing to Stripe for 777's breach of guaranty;

c) In the alternative, judgment in Stripe's favor and against 777 for damages resulting from their intentional or negligent misrepresentations, unjust enrichment, and promissory estoppel;

d) A judgment declaring that Sutton and 777, or either of them, are liable for the obligations in the Guaranty;

e) An award of attorneys' fees and costs incurred by Stripe in connection with enforcing its rights under the Guaranty; and

f) Granting Stripe such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Stripe demands a jury trial on all issues so triable in this action.

Dated: May 15, 2025

        STACK FERNANDEZ & HARRIS, P.A.
        By: s/Robert Harris
        Robert Harris
        Fla. Bar No. 0817783
        rharris@stackfernandez.com
        Brian J. Stack, Esq.
        Fla. Bar No. 476234
        bstack@stackfernandez.com
        255 Alhambra Circle, Suite 330
        Coral Gables, Florida 33143
        305.371.1001

        DAVIS WRIGHT TREMAINE LLP
        John M. Magliery (*pro hac vice* application forthcoming)
        Francesca Reifer (*pro hac vice* application forthcoming)
        1251 Avenue of the Americas
        21st Floor
        New York, New York 10020
        212.489.8230
        johnmagliery@dwt.com
        francescareifer@dwt.com

        Lauren Dorsett (*pro hac vice* application forthcoming)
        920 Fifth Avenue
        Suite 3300
        Seattle, Washington 98104
        206.622.3150
        laurendorsett@dwt.com