# EXHIBIT A



# STRIPE SERVICES AGREEMENT

| Stripe | Stripe Payments Australia Pty Ltd, ACN 160 180 343 |
|---|---|
| SPEL | Stripe Payments Europe, Limited, an Irish registered company |
| User | Bonza Aviation Pty Ltd (ACN: 653 309 909) |
| Effective Date | Date of final signature |
| Stripe Authorized Signature | *Myron Anthony Stein* — Myron Anthony Stein<br>August 1, 2023 |
| SPEL Authorized Signature | *Fanny Talagrand* — Fanny Talagrand<br>August 1, 2023 |
| User Authorized Signature | *Lidia Valenzuela* — Lidia Valenzuela<br>August 1, 2023 |

This Stripe Services Agreement ("**SSA**"), effective as of the effective date stated above ("**Effective Date**"), is entered into by the Stripe entity, SPEL and the user entity stated above (respectively, "**Stripe**", "**SPEL**" and "**User**"). SPEL is a party to this SSA solely for the purposes of processing Personal Data under Section 8 of this SSA. This SSA, together with all Schedules, Exhibits and other documents described in Section 1.1 of this SSA, is referred to as this "**Agreement**."

Stripe and User agree as follows:

1. **General; Affiliates.**

    1.1   Structure. This Agreement consists of:

        (a)   this SSA, which contains the terms that apply to all Services;

        (b)   the following Exhibits:

            (i)   Exhibit 1 – Definitions;

            (ii)   Exhibit 2 – Affiliate Agreement Form;

            (iii)   Exhibit 3 – Regional Services Agreement Form;

            (iv)   Exhibit 4 – Insurance;

(v)       Exhibit 5 – Stripe Data Security; and

(c)       Service Schedules; and

(d)       all other agreements or documents expressly incorporated into any of the documents listed in the foregoing subsections (a) - (c) (if any).

1.2       <u>Definitions</u>. Capitalized terms are defined in <u>Exhibit 1</u>, the Service Schedules and inline.

1.3       <u>Conflict Resolution</u>. If any term in this SSA directly conflicts with a term in any Exhibit, Fee Schedule, Service Schedule, or any other document incorporated by reference into this Agreement, then unless a document of lower precedence expressly states to the contrary, the order of precedence is as follows:

(a)       the Fee Schedule (but only with respect to Services listed in that Fee Schedule);

(b)       the Service Schedule (but only with respect to Services governed by that Service Schedule);

(c)       this SSA;

(d)       the Exhibits; and

(e)       all other documents incorporated by reference into any of the documents listed in the foregoing subsections (a) – (d) (if any).

1.4       <u>Affiliate Agreements; Regional Services Agreements</u>. If a User Affiliate wishes for Stripe or its Affiliate to make Services available to it, then:

(a)       if the User Affiliate is located in the same country (or region, if located in the European Economic Area) as the User (this country or region, "**Territory**"), the User Affiliate and Stripe may execute an Affiliate Agreement in the form of <u>Exhibit 2</u> ("**Affiliate Agreement**"); and

(b)       if the User Affiliate is not located in the Territory, the User Affiliate and the appropriate Stripe entity(ies) may execute a Regional Services Agreement in the form of <u>Exhibit 3</u> ("**RSA**").

All amendments to this Agreement, including additional Service Schedules added by amendment, will apply to the Affiliate Agreements and RSAs unless the amendment states otherwise, and User and Stripe will promptly make all amendments available to their Affiliates that are contracting parties under Affiliate Agreements and RSAs. If any User Affiliate or Stripe Affiliate objects to an amendment applying to its Affiliate Agreement or RSA, as applicable, the objecting party must raise the objection to other party to that agreement within 5 business days after the amendment is executed, in which case the contracting parties to the Affiliate Agreement or RSA will resolve the issue and amend the applicable agreement accordingly.

**2.       Fees; Taxes; User Bank Account.**

2.1       <u>Fees</u>. The parties may enter into one or more Fee Schedules that incorporate the terms of this Agreement and state the fees that apply to certain Services for the term of the Fee Schedule. If User uses a Service (or a Service feature that Stripe prices separately) for

which a fee is not specified in a Fee Schedule, or uses a Service after the applicable Fee Schedule expires or terminates, the fees on the Stripe Pricing Page for that Service or feature (if any) will apply.

2.2   <u>Collection of Fees and Other Amounts</u>. User must pay, or ensure that Stripe is able to collect (as described in the next sentence), fees User owes to Stripe when due. Stripe may deduct fees and other amounts User owes Stripe from User's Stripe Account balance, or invoice User for those fees. If User fails to pay invoiced amounts when due, or Stripe is unable to collect the amounts due from User's Stripe Account balance, then Stripe may deduct those amounts from, in this order: (a) if established and applicable, a Reserve (as defined in a Service Schedule); (b) funds payable by Stripe or its Affiliate to User or its Affiliate under an agreement other than this Agreement; (c) if established and applicable, a User Affiliate Reserve; and (d)the User Bank Account (defined in <u>Section 2.4</u> of this SSA).

2.3   <u>Taxes</u>. Stripe's fees exclude all applicable taxes and duties imposed by any Governmental Authority, including sales and use tax, excise tax, gross receipts tax, value-added tax (VAT), goods and services tax (GST) (or equivalent transaction taxes) and withholding tax (collectively, "**Tax**" or "**Taxes**"), except as a Fee Schedule or the Stripe Pricing Page (as applicable) expressly states to the contrary. User has sole responsibility and liability for:

(a)   determining which, if any, Taxes or fees apply to the sale of its products and services, acceptance of donations, or payments it receives in connection with its use of the Services; and

(b)   assessing, collecting, reporting and remitting Taxes for its business to the appropriate tax and revenue authorities.

If Stripe is required to withhold any Taxes, Stripe may deduct those Taxes from the amount otherwise owed to User and pay those Taxes to the appropriate taxing authority. If User is exempt from paying, or is otherwise eligible to pay a reduced rate on, those Taxes, User may provide to Stripe an original certificate that satisfies applicable legal requirements attesting to its tax-exempt status or reduced rate eligibility, in which case Stripe will not deduct the Taxes covered by the certificate. User must provide accurate information regarding its tax affairs as Stripe reasonably requests. Stripe may send documents to User and taxing authorities for transactions processed using the Services; specifically, Stripe may be required under Law to file periodic informational returns with taxing authorities related to User's use of the Services. User agrees that Stripe may send tax-related information electronically to User.

2.4   <u>User Bank Account; Prohibition on Grant or Assignment</u>. User will designate a bank account associated with its Stripe Account ("**User Bank Account**"). User will not grant or assign any lien on or interest in funds related to this Agreement to any third party until the funds are deposited into the User Bank Account. User authorizes Stripe to debit and credit the User Bank Account in the manner described in this Agreement, and the Direct Debit Request and Direct Debit Service Agreement are incorporated into this Agreement.

**3.     Term and Termination; Suspension.**

3.1   <u>Term</u>. The term of this Agreement begins on the Effective Date and continues until:

DocuSign Envelope ID: B25DF07C-91EC-49E8-8E06-10247245CC21

(a)    either party terminates this Agreement under this <u>Section 3</u> or other provision allowing for termination; or

(b)    all Fee Schedules have terminated or expired;

whichever occurs first ("**Term**").

3.2    <u>Termination</u>.

(a)    *Breach of Agreement.* If a party materially breaches this Agreement and does not cure the breach within 30 business days after receiving written notice specifying the breach, the non-breaching party may terminate this Agreement and all Fee Schedules upon notice to the breaching party. If the material breach affects only certain Services, the non-breaching party may choose to terminate only the affected Service Schedule(s), which will also terminate the applicable portions of corresponding Fee Schedules.

(b)    *Bankruptcy or Insolvency.* A party may terminate this Agreement and all Fee Schedules immediately upon notice to the other party if the other party (i) enters bankruptcy or insolvency proceedings and Law allows termination; or (ii) is unable to pay its debts as they become due.

(c)    *Additional Stripe Termination Rights.*  Stripe may terminate this Agreement and all Fee Schedules (or, if applicable, certain Service Schedules and the corresponding portions of Fee Schedules) upon notice to User:

(i)    if Law requires, or a Governmental Authority or Financial Partner directs Stripe to do so; or

(ii)    if a suspension of Services under <u>Section 3.3</u> of this SSA or any other suspension provision in this Agreement has been in effect for at least 90 days;

(d)    *Effect on Other Agreements.* Termination of this Agreement will not affect any other agreement between the parties or their Affiliates, except for Fee Schedules as described in this <u>Section 3.2</u>.

3.3    <u>Suspension</u>. Stripe may, immediately suspend providing Services to User, including User's access to the Services and the Stripe Technology, if:

(a)    Law requires, or a Governmental Authority or a Financial Partner directs Stripe to do so;

(b)    User fails to timely update its implementation of the Services or Stripe Technology to the latest production version Stripe recommends or requires, and User's failure creates, or is reasonably likely to create, a security, fraud, stability or reliability risk for User's Customers or for Stripe;

(c)    User fails to timely respond to Stripe's request for User Information or provide Stripe adequate time to verify and process updated User Information;

(d)    User breaches <u>Section 4.4</u>, <u>Section 6.1</u>, <u>Section 9.1</u> or <u>Section 10.2</u> of this SSA; or

(e)    User's use of the Services:

DocuSign Envelope ID: B25DF97C-91EC-49E8-8E06-10247245CC21

    (i)      increases, or is reasonably likely to increase, the rate of fraud Stripe observes;

    (ii)     degrades, or is reasonably likely to degrade, the security, stability or reliability of the Stripe services, Stripe Technology or any third party's system (e.g., User's involvement in a distributed denial of service attack); or

    (iii)    enables or facilitates illegal transactions; or is determined by Stripe, acting reasonably, to be unlawful;

but, Stripe may only exercise its suspension rights for the duration and to the extent as Stripe believes is reasonably necessary, and until User remediates the cause of suspension. Stripe may suspend User's Stripe Account at its sole discretion and without notice. However, Stripe will endeavor to notify User of (i) a potential suspension; or (ii) User activity warranting a suspension. If possible, Stripe will also endeavor to give User a reasonable period to remediate the cause of suspension.

3.4    <u>Survival</u>. The following will survive termination of this Agreement:

    (a)    provisions that by their nature are intended to survive termination (e.g., User's obligation to pay fees for Services provided during the Term);

    (b)    provisions that allocate risk, or limit or exclude a party's liability, to the extent necessary to ensure that a party's potential liability for acts and omissions that occur during the Term remains unchanged after the Agreement terminates; and

    (c)    confidentiality obligations (for 3 years after the date of termination).

## 4.    Services.

4.1    <u>Service Schedules</u>. Stripe (and its Affiliates, as applicable) will make available to User the Services described in each Service Schedule attached to this SSA, as well as all Service Schedules the parties add by amendment after the Effective Date, during the term of the applicable Fee Schedule. Each Service Schedule will contain specific terms governing the parties' rights and obligations related to the Services described in that Schedule.

4.2    <u>Subcontracting</u>. Stripe may subcontract its obligations under this Agreement to third parties. As between the parties, Stripe will be responsible for performing its obligations under and in accordance with this Agreement. If Stripe subcontracts its obligations under this Agreement to a third party, Stripe will enter into a written agreement with that third party which contains provisions consistent with Stripe's relevant obligations under this Agreement.

4.3    <u>Supplemental Services</u>. If User uses any features or Stripe services (including features of Services) other than the Services described in the Service Schedules, or outside the Territory, then unless the parties agree to other terms in writing, those services will be governed by the online terms for those services located on or accessible from the Stripe Legal Page (if any), or to which User agreed through the Stripe Dashboard (if any).

4.4    <u>Services Restrictions</u>. User must only use the Services for business purposes, and must not allow any third party to use the Services for personal, family or household purposes. In addition, User must not, and must not allow any third party to:

(a)     resell or distribute the Services;

(b)     work around any of the technical limitations of the Services or enable functionality that is disabled or prohibited;

(c)     except as allowed by Law, reverse engineer or attempt to reverse engineer the Services or Stripe Technology;

(d)     use the Services to engage in any activity that is fraudulent, deceptive or harmful; or

(e)     perform or attempt to perform any action that interferes with the normal operation of the Services or affects other Stripe users' use of Stripe services.

4.5     <u>Investment of Funds</u>. To the extent Law and the applicable Financial Services Terms permit, Stripe may invest the funds that Stripe holds into liquid investments. Stripe and its Affiliates own the earnings from these investments. User irrevocably assigns to Stripe and its Affiliates all rights User has (if any) to earnings from these investments.

4.6     <u>Beta Services</u>.

(a)     *Classification.* Stripe may classify certain Services or Stripe Technology as a whole, or with regard to a particular release or feature, or as offered in certain countries or regions, as being "proof of concept," "beta," "pilot," "invite only" or the like ("**Beta**," and the Beta portion of the Services or Stripe Technology, a "**Beta Service**"). A Service may be generally available in some circumstances (e.g., in some countries) while still classified as a Beta Service in others.

(b)     *Nature of Beta Services.* By their nature, Beta Services may be feature incomplete or contain bugs. Stripe may describe limitations that exist within a Beta Service; however, User's reliance on the accuracy or completeness of these descriptions is at User's own risk. User should not use Beta Services in a production environment until and unless User understands and accepts the limitations and flaws that may be present in the Beta Services.

(c)     *Feedback; Beta Updates.* Unless Stripe otherwise agrees in writing, User's use of Beta Services is confidential, and User will provide timely Feedback (defined in <u>Section 6.2</u> of this SSA) on the Beta Services in response to Stripe requests. Stripe has no obligation to provide any bug fixes, error corrections, patches or service packs for, or any revisions, successors or updated versions to, the Beta Services, or any part of the Beta Services, while the Beta classification is in place (all of the foregoing, if made available by Stripe, "**Beta Updates**"). However, if Stripe provides or makes available a Beta Update, User must fully implement the Beta Update within the time period Stripe specifies, or 30 days after Stripe makes the Beta Update available, whichever is sooner.

(d)     *Availability During Beta Period.* Stripe does not guarantee service levels for Beta Services. Stripe may suspend or terminate User's access to the Beta Services at any time.

4.7     <u>Insurance</u>. Stripe will maintain the insurance coverage listed in <u>Exhibit [4]</u> during the Term.

5.    **User Reporting Obligations.**

5.1    <u>User Compliance Information</u>. Upon Stripe's request, User will provide to Stripe (in a form satisfactory to Stripe) the User Compliance Information.

5.2    <u>User Financial Information</u>. Upon Stripe's request, User will provide to Stripe (in a form satisfactory to Stripe) the User Financial Information. Stripe will not request User Financial Information more often than annually unless, in Stripe's reasonable opinion, there is a material change in User's business or financial condition.

5.3    <u>User Information Updates</u>. User must immediately notify Stripe, and provide to Stripe updated User Information, if (a) User experiences or anticipates experiencing a Change of Control; (b) User experiences or anticipates experiencing a material change in User's business or financial condition; (c) the regulatory status of the business for which User is using the Services changes, including if it becomes subject, or no longer subject, to regulatory oversight; or (d)a Governmental Authority has notified User that its business is the subject of an investigation action.

5.4    <u>Changes to Business Activity</u>. If User wishes to use the Services in connection with a business activity or category of good or service that, prior to the Effective Date, Stripe did not agree to support, User will notify its Stripe account manager and seek Stripe's consent. User will not use the Services in connection with the new business activity or category until and unless User receives Stripe's written consent.

6.    **Use Rights.**

6.1    <u>Use of Services</u>. Subject to the terms and conditions of this Agreement, Stripe grants to User a worldwide, non-exclusive, non-transferable (except as allowed under <u>Section 13.8</u> of this SSA), non-sublicensable, royalty-free license during the Term to access the Documentation, and access and use the Stripe Technology, as long as User's access and use is (a) solely as necessary to use the Services; (b) solely for User's business purposes; and (c) in compliance with this Agreement and the Documentation.

6.2    <u>Feedback</u>. During the Term, a party and its Affiliates may provide to the other party and its Affiliates ideas, suggestions, comments, observations and other input regarding the other party's products and services ("**Feedback**"). Feedback is voluntary, and the party providing the Feedback grants, on behalf of itself and its Affiliates, to the receiving party and its Affiliates a perpetual, worldwide, non-exclusive, irrevocable, royalty-free license to exploit that Feedback for any purpose, including developing, manufacturing, promoting, selling and maintaining the receiving party's and its Affiliates' products and services. All Feedback that User and its Affiliates provide to Stripe and its Affiliates is considered Stripe's Confidential Information, and all Feedback that Stripe and its Affiliates provide to User and its Affiliates is considered User's Confidential Information.

6.3    <u>Marks Usage</u>. Subject to the terms and conditions of this Agreement, each party grants to the other party and its Affiliates a worldwide, non-exclusive, non-transferable (except as allowed under <u>Section 13.8</u> of this SSA), non-sublicensable, royalty-free license during the Term to use the grantor party's trademarks, service marks, design marks, logos and stylized scripts (collectively, "**Marks**") solely to identify Stripe as User's service provider. Accordingly, Stripe and its Affiliates may use User's Marks:

(a)    on Stripe webpages and apps that identify Stripe's customers;

(b)    in Stripe sales/marketing materials and communications;

(c)    in connection with promotional activities to which the parties agree in a Fee
Schedule or other writing; and

(d)    in financial disclosure documents.

When using Stripe's Marks, User must comply with the terms found at
https://stripe.com/marks/legal and all additional usage terms or guidelines that Stripe
provides to User in writing (if any). When using User's Marks, Stripe will comply with the
usage terms or guidelines that User provides to Stripe in writing (if any). All goodwill
generated from the use of the grantor party's Marks will inure to the sole benefit of the Mark
owner.

6.4    No Joint Development; Reservation of Rights. Any joint development between the parties
will require and be subject to a separate agreement between the parties. Nothing in this
Agreement assigns or transfers ownership of any IP Rights to the other party. All rights not
expressly granted in this Agreement are reserved.

7.    **Confidentiality.**

7.1    Confidential Information. "**Confidential Information**" means the terms and conditions of
this Agreement and all Fee Schedules, and all other information disclosed by one party or
its Affiliate ("**Disclosing Party**") to the other party or its Affiliate ("**Receiving Party**") in
connection with this Agreement or related to the Services that is identified as confidential or
proprietary or that, given the nature of the information or the manner of its disclosure, a
reasonable recipient would understand to be confidential or proprietary (including all
information relating to the Disclosing Party's technology, business plans, marketing
activities and finances). All disclosed Confidential Information will remain the Disclosing
Party's exclusive property, and the Receiving Party will have no right to use this information
except as this Agreement expressly allows.

7.2    Use; Protection. The Receiving Party will:

(a)    protect and keep confidential the Disclosing Party's Confidential Information;

(b)    not disclose the Disclosing Party's Confidential Information to any third party without
the Disclosing Party's consent; and

(c)    use the Disclosing Party's Confidential Information only for the purpose(s) for which
it was originally disclosed, and in any case only for the purpose of fulfilling its
obligations and exercising its rights under this Agreement.

7.3    Allowed Disclosures. The Receiving Party may disclose Confidential Information without the
other party's consent:

(a)    to the Receiving Party's Affiliates;

(b)    to the Receiving Party's professional advisors that are subject to a strict duty of
confidentiality;

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

(c)  to the extent required by Law (including filings made to national security exchanges, including the US Security Exchange Commission) or court order, or directed by a Governmental Authority, as long as the Receiving Party notifies the other party (unless prohibited by Law from doing so), uses diligent reasonable efforts to limit disclosure and to obtain confidential treatment or a protective order, and has, to the extent allowed and reasonably possible, allowed the Disclosing Party to participate in the process or proceeding; and

(d)  where Stripe is the Receiving Party, to Financial Partners and their respective Affiliates, and to Stripe's third-party service providers, as necessary to perform the Services.

7.4  <u>Exclusions</u>. The restrictions and obligations in <u>Section 7.2 and 7.3</u> of this SSA will not apply with respect to any information that the Receiving Party can prove through written documentation:

(a)  is generally available to the public through no improper action or inaction by the Receiving Party or its Affiliates, or one of their employees or representatives;

(b)  it knew or possessed without restriction prior to receiving it from the Disclosing Party;

(c)  was rightfully disclosed to it by a third party without breach of any confidentiality obligation; or

(d)  was independently developed by the Receiving Party's employees who have had no access to the information.

**8.  Privacy and Data Use.**

8.1  <u>Privacy and Data Definitions</u>.

(a)  "**Personal Data**" means any information relating to an identifiable natural person that Stripe or User processes (e.g., transmits or accesses) through the Services, and includes "personal data" as defined under EU Regulation (EU) 2016/679 (General Data Protection Regulation or GDPR) and "personal information" as defined under the California Consumer Privacy Act of 2018 (CCPA) and the Australian Privacy Act 1988 (the "**Privacy Act**").

(b)  "**Protected Data**" means all User Information and Personal Data.

(c)  "**Stripe Data**" means data that User obtains via the Services, including (i) information relating to the Stripe API interactions via the Stripe Technology; (ii) information Stripe uses for security or fraud prevention; and (iii) all aggregated information Stripe generates from the Services.

8.2  <u>Privacy Policies</u>. Each party will make available a Privacy Policy that complies with Law. Each party will comply with its Privacy Policy (which for Stripe is accessible from the Stripe Legal Page) in connection with the Services. "**Privacy Policy**" means any or all of a publicly posted privacy policy, privacy notice, data policy, cookies policy, cookies notice or other similar public policy or public notice that addresses a party's Personal Data practices and commitments.

8.3 <u>Personal Data</u>. When User provides Personal Data about Customers to Stripe, or authorizes Stripe to collect Personal Data about Customers, User must provide all necessary notices to and obtain all necessary rights and consents from those Customers sufficient to enable Stripe to lawfully collect, use, retain and disclose the Personal Data as described in <u>Section 8.4</u> of this SSA. User will determine the content of notices it provides to its Customers in this regard. Stripe will not sell or lease Personal Data that Stripe receives from User to any third party.

8.4 <u>Protected Data</u>. To the extent Law permits, Stripe will only use Protected Data to (a) secure, provide, provide access to and update the Stripe services; (b) fulfill its obligations under Law, and comply with Financial Partner and Governmental Authority requirements and requests; and (c) prevent and mitigate fraud, financial loss and other harm.

8.5 <u>Stripe Data</u>. User will use the Stripe Data it receives from Stripe only as this Agreement and other agreements between Stripe and User (or their Affiliates) permit.

8.6 <u>Data Incidents</u>.

(a) *Data Incident Notification.* A party that experiences a Data Incident ("**Data Custodian**") will notify the other party without unreasonable delay after it becomes aware of the Data Incident. If the Data Incident involves Personal Data, the party must provide the notice no later than 48 hours after becoming aware of the Data Incident. This notice will describe in reasonable detail:

(i) the type of data that was the subject of the Data Incident;

(ii) the categories and potential number of individuals or records affected (including their countries); and

(iii) the status of the Data Custodian's investigation and current or planned remediation.

(b) *Data Incident Investigations.* The Data Custodian will investigate the Data Incident and use commercially reasonable efforts to mitigate the Data Incident. The parties will reasonably cooperate with each other so that each party may (i) determine and comply with its legal obligations with respect to notifying impacted individuals and regulators, including any notification requirements in respect of an "eligible data breach" (as defined in the Privacy Act); and (ii) provide information to law enforcement, if applicable.

(c) *End User Notification; Costs.* The party obligated to notify impacted individuals will be responsible for providing all legally required notices (if any), and the parties will reasonably cooperate on the notice content and notification process. If Stripe is the Data Custodian with respect to the Data Incident, Stripe will pay the Data Incident Costs for individuals impacted by a Data Incident and, where applicable, directly engage a credit monitoring service. "**Data Incident Costs**" means the reasonable out of pocket amounts paid to provide legally required notice to individuals and, where Law requires, includes the amounts paid to a third party for credit monitoring services for impacted individuals for 1 year or the term required by Law, whichever is longer.

8.7 <u>Retention of Protected Data</u>. Stripe will not be obligated to retain Protected Data after the Term, except as (a) required by Law; (b) required for Stripe to perform any post-termination obligations; (c) this Agreement otherwise states; or (d) the parties otherwise agree in writing.

8.8 <u>Data Processing Agreement</u>. Stripe and User will comply with the DPA.

**9.    Data Security.**

9.1 <u>Controls</u>. Each party will maintain commercially reasonable administrative, technical and physical controls designed to protect data in its possession or under its control from unauthorized access, accidental loss and unauthorized modification.

9.2 <u>Stripe Account Credentials</u>. User will use commercially reasonable efforts to prevent the unauthorized disclosure or use of its Stripe Account credentials, and otherwise ensure that its Stripe Account is not used or modified by anyone other than User and its representatives. If User believes that its Stripe Account credentials have been wrongly accessed, disclosed or used, it will promptly notify Stripe.

9.3 <u>Unauthorized Use or Access</u>. If an unauthorized access, disclosure or use of User's Stripe Account credentials ("**Credential Compromise**") occurs, User will cooperate with Stripe to provide information Stripe reasonably believes is necessary to enable Stripe to take reasonable steps to mitigate the impact of the Credential Compromise. Any steps Stripe takes will not diminish User's responsibility for Credential Compromises.

9.4 <u>Stripe Data Security</u>. Stripe will comply with its data security obligations in <u>Exhibit 5</u>.

**10.   Representations and Warranties.** Unless this Agreement expressly states to the contrary elsewhere, the following representations and warranties apply generally to each party's performance under this Agreement. Additional representations and warranties that apply only to a specific Service may be included in a Service Schedule.

10.1 <u>Stripe</u>. Stripe represents as of the Effective Date, and warrants during the Term, that:

(a)    Stripe has the right, power and ability to enter into and perform under this Agreement;

(b)    Stripe maintains all regulatory licenses, permits and other permissions (or waivers) necessary to provide the Services;

(c)    Stripe's performance under this Agreement and provision of the Services complies with Law; and

(d)    the Services comply with PCI-DSS, as applicable.

10.2 <u>User</u>. User represents as of the Effective Date, and warrants during the Term, that:

(a)    User has the right, power and ability to enter into and perform under this Agreement;

(b)    User has all necessary rights and consents to allow User to access and use the Services in accordance with this Agreement and Law;

(c)    User is authorized to initiate settlements to and debits from the User Bank Account;

(d)  User beneficially owns the User Bank Account and the User Bank Account is held in User's own name;

(e)  User complies with Law that applies to its business, including Law that applies to its use of the Services and Stripe Technology;

(f)  User complies with the Documentation;

(g)  User complies with the Financial Services Terms, and is not engaging in activity that any Financial Partner identifies as damaging to its brand;

(h)  User does not use the Services to conduct a Restricted Business or use the Services to transact with any Restricted Business, except as approved by Stripe; and

(i)  all information User provides to Stripe, including the User Information, is complete and accurate.

11.  **Indemnity.** Unless this Agreement expressly states to the contrary elsewhere, the following defense and indemnification obligations apply generally under this Agreement. Additional indemnification and defense obligations may be stated elsewhere in this Agreement (e.g., in a Service Schedule), and the process outlined in <u>Section 11.5</u> below will apply to those obligations. In this <u>Section 11</u>, "**gross negligence**" means a serious disregard for, or an indifference to, an obvious risk.

11.1  <u>Stripe General Indemnification</u>.

(a)  *Defense*. Stripe will defend User, its Affiliates, and the directors, employees and agents of each (each, a "**User Party**") against any claim, demand, government investigation or legal proceeding made or brought by a third party ("**Claim**") made against any User Party to the extent arising out of:

(i)  Stripe's material breach of any Stripe representation, warranty or obligation under this Agreement; or

(ii)  Stripe's gross negligence, willful misconduct or fraud.

(b)  *Indemnification*. Stripe will indemnify the User Parties against all User Losses. "**User Losses**" means all amounts finally awarded to the third party making the Claim, and all penalties, fines and reasonable third-party costs (including reasonable legal fees) paid by the User Parties, to the extent arising out of a Claim described in <u>Section 11.1(a)</u> above.

(c)  *Limitations*. Stripe's obligations in this <u>Section 11.1</u> do not apply to the extent the Claim arises out of:

(i)  User's breach of this Agreement;

(ii)  User's negligence, fraud or willful misconduct; or

(iii)  a User Party's failure to implement the Stripe Technology or use the Services in accordance with the Documentation and this Agreement.

11.2   <u>Stripe IP Infringement</u>.

(a)   *Defense and Indemnification*. Stripe will defend the User Parties against any Claim made against any User Party alleging that the Stripe Technology, Services or a Stripe Mark provided to and used by User or its Affiliates in accordance with this Agreement infringes on or misappropriates the IP Rights of the third party making the Claim ("**IP Claim**"). Stripe will indemnify the User Parties against all IP Claim Losses. "**IP Claim Losses**" means all amounts finally awarded to the third party making the IP Claim, and all penalties, fines and reasonable third-party costs (including reasonable legal fees) paid by the User Parties to the extent arising out of an IP Claim.

(b)   *Limitations*. Stripe's obligations in this <u>Section 11.2</u> do not apply:

(i)   if the allegations do not specify that the Stripe Technology is the basis of the IP Claim;

(ii)   to the extent the IP Claim or IP Claim Losses arise out of the use of the Stripe Technology in combination with software, hardware, data or processes not provided by Stripe (if the Stripe Technology would not infringe absent the combination);

(iii)   to the extent the IP Claim or IP Claim Losses arise out of User's failure to implement, maintain and use the Stripe Technology in accordance with the Documentation and this Agreement;

(iv)   to the extent the IP Claim or IP Claim Losses arise out of User's breach of this Agreement; or

(v)   to the extent the IP Claim or IP Claim Losses arise out of a User Party's gross negligence, fraud or willful misconduct.

(c)   *Other Stripe Actions*. Stripe may in its discretion and at no additional expense to User:

(i)   modify the Stripe Technology or Services so that they are no longer claimed to infringe or misappropriate;

(ii)   replace the affected Stripe Technology or Services with a non-infringing alternative;

(iii)   obtain a license for User to continue to use the affected Stripe Technology or Services; or

(iv)   terminate User's use of the affected Stripe Technology or Services upon 30 days' written notice.

(d)   **Exclusive Remedy. This <u>Section 11.2</u> states the Stripe Parties' sole liability, and the User Parties' sole and exclusive right and remedy, for infringement by the Stripe Technology, Services or Stripe Marks, including any IP Claim, and the User Parties must seek indemnification for IP Claims only under this <u>Section 11.2</u> (and not <u>Section 11.1</u> above).**

11.3    Data Claims.

(a)    *Defense.* Each of Stripe and User (respectively, the "**Indemnifying Party**") will defend the other party, its Affiliates, and the directors, employees and agents of each (each, an "**Indemnified Party**") against any Claim arising from a Data Incident experienced by the Indemnifying Party ("**Data Claim**") to the extent the Data Incident was caused by the Indemnifying Party's:

(i)    breach of the DPA, or Section 8 or Section 9 of this SSA; or

(ii)   violation of a Law governing privacy or data protection.

(b)    *Indemnification.* The Indemnifying Party will indemnify the Indemnified Party against all Data Claim Losses. "**Data Claim Losses**" means all amounts finally awarded to the third party making the Data Claim described in Section 11.3(a) above, and all penalties paid, fines paid and reasonable legal fees paid by the Indemnified Party to a third party in defense of the Data Claim, all to the extent arising out of the Data Claim.

(c)    *Limitations.* The Indemnifying Party's obligations in this Section 11.3 do not apply to the extent the Data Claim arises out of:

(i)    the Indemnified Party's breach of this Agreement;

(ii)   the Indemnified Party's negligence, fraud or willful misconduct; or

(iii)  when Stripe is the Indemnifying Party, a User Party's failure to implement the Stripe Technology or use the Services in accordance with the Documentation and this Agreement.

(d)    ***Exclusive Remedy*. This Section 11.3, Section 8.6(c) and Section 12.2(c) of this SSA state the Indemnifying Parties' and their Affiliates' entire liability to the Indemnified Party and its Affiliates, and the Indemnified Party's sole and exclusive rights and remedies, for Data Claims, and the Indemnified Party must seek indemnification for all Data Claims only under this Section 11.3 (and not Section 11.1 or 11.4 of this SSA).**

11.4    User General Indemnification.

(a)    *Defense.* User will defend Stripe, its Affiliates, and the directors, employees and agents of each (each, a "**Stripe Party**") against any Claim made against any Stripe Party to the extent arising out of:

(i)    User's material breach of any User representation, warranty or obligation under this Agreement;

(ii)   User's use of the Services;

(iii)  an allegation that a User Mark provided to and used by Stripe or its Affiliates in accordance with this Agreement infringes on or misappropriates the IP Rights of the third party making the Claim; or

(iv)   User's gross negligence, willful misconduct or fraud.

(b) *Indemnification.* User will indemnify the Stripe Parties against all Stripe Losses. "**Stripe Losses**" means all amounts finally awarded to the third party making the Claim, and all penalties, fines and reasonable third-party costs (including reasonable legal fees) paid by the Stripe Parties, to the extent arising out of a Claim described in Section 11.4(a) above.

(c) *Limitations.* User's obligations in this Section 11.4 do not apply to the extent the Claim arises out of:

(i) Stripe's breach of this Agreement; or

(ii) Stripe's gross negligence, fraud or willful misconduct.

11.5 Process of Defense and Indemnification. The Indemnified Party must promptly notify the Indemnifying Party of the Claim for which the Indemnified Party seeks indemnification; however, any delay or failure to notify will not relieve the Indemnifying Party of its obligations under this Section 11, except to the extent it has been prejudiced by the delay or failure. The Indemnifying Party will have sole control and authority to defend and settle the Claim, but:

(a) the Indemnified Party may participate in the defense and settlement of the Claim with counsel of its own choosing at its own expense; and

(b) the Indemnifying Party will not enter into any settlement that imposes any obligation on the Indemnified Party (other than payment of money, which the Indemnifying Party will pay) without the Indemnified Party's consent.

The Indemnified Party will reasonably cooperate at the Indemnifying Party's request and expense in connection with the Claim.

12. **Disclaimers and Limitations on Liability.** The following limitations will apply notwithstanding the failure of the essential purpose of any limited remedy.

12.1 **Disclaimer.**

(a) ***Stripe Disclaimer.* Except as expressly stated as a "warranty" in this Agreement, and to the maximum extent permitted by Law, Stripe does not make any, and expressly disclaims all, express and implied warranties and statutory guarantees with respect to its performance under this Agreement, the Services, Financial Partners, the Stripe Technology and the Documentation, including as related to availability, the implied warranties of fitness for a particular purpose, merchantability and non-infringement, and the implied warranties arising from any course of dealing, course of performance or usage in trade.**

(b) ***User Disclaimer.* Except as expressly stated as a "warranty" in this Agreement, and to the maximum extent permitted by Law, User does not make any, and expressly disclaims all, express and implied warranties and statutory guarantees with respect to its performance under this Agreement, including the implied warranties for fitness for a particular purpose, merchantability and non-infringement, and the implied warranties arising from any course of dealing, course of performance or usage in trade.**

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

12.2    Limitations on Liability.

(a)    *Indirect Damages.* Except for:

(i)    damages a party incurs that arise out of the other party's breach of Section 7 of this SSA (a Data Incident will not constitute a breach of Section 7);

(ii)   damages a party incurs that arise out of the other party's willful misconduct, fraud or criminal activity;

(iii)  Data Incident Costs; and

(iv)   Data Claim Losses (subject to Section 12.2(c) of this SSA), User Losses, IP Claim Losses and Stripe Losses,

to the maximum extent permitted by Law, neither party or its Affiliates will be liable to the other party or its Affiliates in relation to this Agreement or the Services during and after the Term, whether in contract, negligence, strict liability, tort or other legal or equitable theory, for any lost profits, loss of data, business interruption, indirect, incidental, consequential, exemplary, special, reliance or punitive damages, even if advised of the possibility of these damages.

(b)    *General Damages.* Except for:

(i)    damages a party incurs that arise out of the other party's breach of Section 7 of this SSA (a Data Incident will not constitute a breach of Section 7);

(ii)   damages a party incurs that arise out of the other party's willful misconduct, fraud or criminal activity;

(iii)  Data Incident Costs; and

(iv)   User Losses, IP Claim Losses and Stripe Losses,

to the maximum extent permitted by Law, a party and its Affiliates will not be liable to the other party and its Affiliates in relation to this Agreement or the Services during and after the Term, whether in contract, negligence, strict liability, tort or other legal or equitable theory, for damages exceeding in the aggregate the total amount of fees User and its Affiliates paid to Stripe and its Affiliates (excluding all pass-through fees levied by Financial Partners) during the 1-year period immediately preceding the event giving rise to the liability.

(c)    *Data Claim Losses.* Notwithstanding Section 12.2(b) of this SSA, to the maximum extent permitted by Law, a party and its Affiliates will not be liable to the other party and its Affiliates for Data Claim Losses exceeding in the aggregate four times the total amount of fees User and its Affiliates paid to Stripe and its Affiliates (excluding all pass-through fees levied by Financial Partners) during the 1-year period immediately preceding the event giving rise to the liability.

**13.**    General Provisions.

13.1    Governing Law; Jurisdiction; Venue. The laws applicable in Victoria, Australia will govern this Agreement, without giving effect to its conflicts of law principles. The United Nations

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

Convention on Contracts for the International Sale of Goods will not apply to this Agreement. Each party irrevocably submits to exclusive personal jurisdiction, and will bring all suits and actions under or in connection with this Agreement exclusively, in the courts located in Victoria, Australia, and each party waives all objections to those jurisdictions and venues.

13.2    Attorneys' Fees. In any action or suit to enforce or to interpret this Agreement, the prevailing party is entitled to recover the reasonable legal costs it paid to third parties.

13.3    No Jury Trial. Each party waives, to the fullest extent permitted by Law, any right it may have to a trial by jury with respect to any action or proceeding arising out of or relating to this Agreement.

13.4    Notices. Unless this Agreement states otherwise, all notices under this Agreement must be given by email. For notices to Stripe, the email address is contract-notices@stripe.com; for notices to User, the email address is the address listed on the applicable Stripe Account. Notice is effective one business day after sending the email.

13.5    Interpretation.

(a)    No provision of this Agreement will be construed against any party on the basis of that party being the drafter.

(b)    References to "includes" or "including" not followed by "only" or a similar word mean "includes, without limitation" and "including, without limitation," respectively.

(c)    All references in this Agreement to any documents, Law or Financial Services Terms are to those items as they may be amended, supplemented or replaced from time to time. All references to APIs and URLs are references to those APIs and URLs as they may be updated or replaced.

(d)    The section headings of this Agreement are for convenience only, and have no interpretive value.

(e)    Unless expressly stated otherwise, any consent or approval that may be given by a party (i) is only effective if given in writing and in advance; and (ii) may be given or withheld in the party's sole and absolute discretion.

(f)    References to "business days" means weekdays on which banks are generally open for business. Unless specified as business days, all references in this Agreement to days, months or years mean calendar days, calendar months or calendar years.

(g)    Unless expressly stated otherwise, any payment that otherwise would be due on a day that is not a business day will be due on the first following business day.

13.6    Waivers. To be effective, a waiver must be in a writing signed by the waiving party. The failure of either party to enforce any provision of this Agreement will not constitute a waiver of that party's rights to subsequently enforce the provision.

13.7    Force Majeure. Neither party will be liable for any loss or damage to the other party, or delays in performance, to the extent caused by events over which the affected party has no

reasonable control. However, nothing in this <u>Section 13.7</u> will excuse User's liabilities and obligations with respect to payment of fees owed to Stripe.

13.8    <u>Assignment</u>. Neither party may assign or transfer any obligations or benefit under this Agreement without the consent of the other party, except:

(a)    Stripe may, without User's consent, assign and transfer this Agreement, including any of its rights or obligations under this Agreement, to any Stripe Affiliate; and

(b)    User may, with Stripe's consent, which Stripe will not unreasonably withhold, delay or condition, assign and transfer this Agreement, including any of its rights or obligations under this Agreement, to any User Affiliate.

Any attempt to assign in violation of the foregoing sentence will be void in each instance. This Agreement will be binding upon, inure to the benefit of, and be enforceable by the parties and their permitted assigns.

13.9    <u>Export Control</u>. User must not use or otherwise export, re-export or transfer the Stripe Technology except as authorized by United States law and the laws of the jurisdiction(s) in which the Stripe Technology was distributed and obtained, including (a) into any U.S. embargoed country, or country embargoed by the jurisdiction where the Stripe Technology was obtained (each, an "**Embargoed Country**"); or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals, the U.S. Department of Commerce Denied Persons List or Entity List or any other restricted or prohibited party list administered by the U.S., United Kingdom, European Union or United Nations (each list, a "**Restricted Party List**"). By using the Stripe Technology, User represents as of the Effective Date and warrants during the Term that it is not (x) located in or organized under the laws of any Embargoed Country; (y) on any Restricted Party List; or (z) owned 50% or more or controlled by persons or parties (i) located in or, as applicable, organized under the laws of any Embargoed Country, or (ii) on any Restricted Party List. User must not use the Stripe Technology for any purposes prohibited by Law, including the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons.

13.10    <u>No Agency</u>. Each party to this Agreement is an independent contractor. Nothing in this Agreement serves to establish a partnership, joint venture or general agency relationship between Stripe and User. If this Agreement expressly establishes a limited agency relationship between User as principal and Stripe as limited agent, the agency conferred, including User's rights as principal and Stripe's obligations as limited agent, is limited strictly to the stated appointment and purpose and implies no duty to User or Stripe, and will in no event establish an agency relationship for tax purposes.

13.11    <u>Severability</u>. If any court or governmental authority determines a provision of this Agreement is unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provision were not present and that any partially valid and enforceable provision be enforced to the extent that it is enforceable.

13.12    <u>Cumulative Rights; Injunctions</u>. The rights and remedies of the parties under this Agreement are cumulative, and each party may enforce any of its rights or remedies under this Agreement, along with all other rights and remedies available to it at law, in equity or under the Financial Services Terms. Any material breach by a party of <u>Section 7</u> or <u>Section 8</u> above could cause the non-breaching party irreparable harm for which the non-breaching

party has no adequate remedies at law. Accordingly, the non-breaching party is entitled to seek specific performance or injunctive relief for the breach.

13.13   <u>Entire Agreement; Modification; Counterparts</u>. The documents listed in <u>Section 1.1</u> of this SSA, together with all Fee Schedules, constitute the entire agreement and understanding of the parties with respect to the Services, and supersede all prior and contemporaneous agreements and understandings. No nondisclosure agreement between the parties or their Affiliates (if any) will apply to Confidential Information. Except as this Agreement otherwise allows, this Agreement may not be modified except in a writing signed by the parties. **However, upon notice to User, Stripe may modify this Agreement to comply with changes to Law and Financial Services Terms or a Financial Partner's requirements. Where this occurs, Stripe will provide to User as much advance notice as is reasonably possible prior to the relevant modification taking effect**. This Agreement may be executed electronically, and in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one and the same agreement.

## EXHIBIT 1 – DEFINITIONS

"**Affiliate**" means an entity that directly or indirectly Controls, is Controlled by or is under common Control with another entity.

"**Change of Control**" means (a) an event in which any third party or group acting together, directly or indirectly, acquires or becomes the beneficial owner of, more than 50% of a party's voting securities or interests; (b) a party's merger with one or more third parties; (c) a party's sale, lease, transfer or other disposal of all or substantially all of its assets; or (d) entering into of any transaction or arrangement that would have the same or similar effect as a transaction referred to in the foregoing (a)-(c); but, does not include an initial public offering or listing.

"**Control**" means direct or indirect ownership of more than 50% of the voting power or equity in an entity.

"**Customer**" means User's customer or donor.

"**Data Incident**" means:

(a)     when Stripe is the Data Custodian, an unauthorized or unlawful processing, use, access, loss, disclosure, destruction or alteration of any Protected Data in Stripe's or its Affiliate's, or Stripe's or its Affiliate's subcontractor's, agent's or representative's, possession or control; and

(b)     when User is the Data Custodian, an unauthorized or unlawful processing, use, access, loss, disclosure, destruction or alteration of any (i) Protected Data in User's or its Affiliate's, or User's or its Affiliate's subcontractor's, agent's or representative's, possession or control; or (ii) Stripe Data in User's or its Affiliate's, or User's or its Affiliate's subcontractor's, agent's or representative's, possession or control.

"**Data Processing Agreement**" or "**DPA**" means the data processing agreement located at www.stripe.com/[countrycode]/legal/dpa, where "[countrycode]" means the two-letter abbreviation for the country where User's Stripe Account is located.

"**Direct Debit Request and Direct Debit Service Agreement**" means Stripe's Direct Debit Request and Direct Debit Service Agreement, which describe how Stripe may debit a User Bank Account, and are located at https://stripe.com/en-au/legal#direct-debit or as otherwise provided by Stripe to User.

"**Documentation**" means the sample code, instructions, requirements and other documentation available on the Stripe website, the first page of which is located at https://stripe.com/docs.

"**Fee Schedule**" means a Schedule executed by the parties (or their Affiliates, if applicable) that contains fees for Services and incorporates the terms of this Agreement by reference.

"**Financial Partner**" means a third party that provides financial services and with which Stripe or its Affiliate interacts to provide the Services.

"**Financial Services Terms**" means (a) the rules and terms a Financial Partner specifies that apply to that entity's services; and (b) PCI-DSS and PA-DSS, including successor standards (if any).

"**Governmental Authority**" means a regulator or other governmental agency or entity with jurisdiction over the Services, Stripe or User, as applicable.

"**IP Rights**" means all copyrights, patents, trademarks, service marks, trade secrets, moral rights and other intellectual property rights.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

"**Law**" means all applicable laws, rules, regulations and other binding requirements of any Governmental Authority.

"**PA-DSS**" means the Payment Application Data Security Standard.

"**PCI-DSS**" means the Payment Card Industry Data Security Standards.

"**Restricted Business**" means any category of business or business practice for which a Service cannot be used, as identified on the Stripe Restricted Business List (located on the Stripe Website) for the applicable Service and jurisdiction of User's Stripe Account.

"**Services**" means services Stripe makes available to User under this Agreement.

"**Stripe Account**" means User's Stripe account.

"**Stripe API**" means all instances of the Stripe application programming interfaces, including all endpoints that enable User to use the Services.

"**Stripe Dashboard**" means the interactive user interface through which a Stripe user is able to view information about that user's Stripe account.

"**Stripe Legal Page**" means www.stripe.com/[countrycode]/legal, where "[countrycode]" means the two-letter abbreviation for the country where User's Stripe Account is located.

"**Stripe Pricing Page**" means www.stripe.com/[countrycode]/pricing, where "[countrycode]" means the two-letter abbreviation for the country where User's Stripe Account is located.

"**Stripe Technology**" means all hardware, software, application programming interfaces (including the Stripe API), user interfaces (including the Stripe Dashboard), and other technology that Stripe uses to provide and make available the Stripe services.

"**Stripe Website**" means www.stripe.com.

"**User Compliance Information**" means information about User that Stripe reasonably requires to comply with Law and Governmental Authority and Financial Partner requirements, and may include information (including Personal Data) about User's representatives, beneficial owners, principals and other individuals associated with User's Stripe Account.

"**User Financial Information**" means (a) information about User that Stripe reasonably requires to assess User's business and financial condition and outstanding credit exposure, including financial statements (and, where applicable, unaudited management accounts including a profit and loss account, balance sheet and cash-flow statement) and supporting documentation (including bank statements); (b) information and supporting documentation to enable Stripe to calculate User's risk of loss; and (c) all other information Stripe reasonably requests to assess User's risk and ability to perform its obligations under this Agreement.

"**User Information**" means User Compliance Information and User Financial Information.

### EXHIBIT 2 – AFFILIATE AGREEMENT FORM

### AFFILIATE AGREEMENT – [INSERT TERRITORY]

| | |
|---|---|
| **Stripe** | [insert same entity as SSA] |
| **User Affiliate** | [insert] |
| **Agreement** | Stripe Services Agreement between Stripe and [User entity] with an Effective Date of [insert] |
| **AA Effective Date** | [Insert] |
| **Stripe Authorized Signature** | |
| **User Affiliate Authorized Signature** | |

This Affiliate Agreement ("**Affiliate Agreement**"), effective as of the date stated above ("**AA Effective Date**"), is entered into by Stripe and the User entity stated above ("**User Affiliate**"). All capitalized terms not defined in this Affiliate Agreement will have the meanings given to them in the Agreement.

**1.      Affiliate Agreement Terms and Amendments.**

1.1    <u>Incorporated Terms</u>. Subject to <u>Sections 1.2 and 2</u> of this Affiliate Agreement, all of the terms of the Agreement, including all Exhibits, Schedules and other documents incorporated into the Agreement, are incorporated into this Affiliate Agreement (these terms, the "**Incorporated Terms**").

1.2    <u>Amendments to the Agreement</u>. All amendments to the Agreement (each, an "**Amendment**") will apply to this Affiliate Agreement unless the Amendment states otherwise. If either party objects to an Amendment (or applicable portions of the Amendment) applying to this Affiliate Agreement, the objecting party must raise the objection to the other party within 5 business days after the Amendment is executed, in which case the parties will resolve the issue and amend this Affiliate Agreement accordingly. If neither party objects to an Amendment (or applicable portions of an Amendment) applying to this Affiliate Agreement within the 5-business day window, then the Amendment will amend this Affiliate Agreement, and each party waives any defence of unenforceability, lack of power or lack of authority.

**2.      Replacement Terms.**

2.1    <u>Parties</u>. References "User" in the Incorporated Terms mean User Affiliate. References to the "parties" in the Incorporated Terms mean the parties to this Affiliate Agreement.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

2.2     <u>Agreement</u>. References to "Agreement" in the Incorporated Terms mean this Affiliate Agreement.

2.3     <u>Effective Date</u>. References to "Effective Date" in the Incorporated Terms mean AA Effective Date.

3.      **Termination of the Agreement.** Any termination of the Agreement will not affect this Affiliate Agreement.

4.      **Conflicts.** Any conflict between the terms of this Affiliate Agreement and the Agreement will be resolved in favor of this Affiliate Agreement for purposes of this Affiliate Agreement.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

**EXHIBIT 3 – RSA FORM**

**REGIONAL SERVICES AGREEMENT – <mark>[INSERT TERRITORY]</mark>**

| | |
|---|---|
| **Stripe Affiliate** | [insert] |
| **User Affiliate** | [insert] |
| **Agreement** | Stripe Services Agreement between [Stripe entity] and [User entity] with an Effective Date of <mark>[insert]</mark> |
| **RSA Effective Date** | [Insert] |
| **Stripe Affiliate Authorized Signature** | |
| **User Affiliate Authorized Signature** | |

This Regional Services Agreement ("**RSA**"), effective as of the date stated above ("**RSA Effective Date**"), is entered into by the Stripe entity and the User entity stated above (respectively, "**Stripe Affiliate**" and "**User Affiliate**"). All capitalized terms not defined in this RSA will have the meanings given to them in the Agreement.

1. **RSA Terms and Amendments: General.**

    1.1   <u>Incorporated Terms</u>. Subject to <u>Sections 1.2, 2 and 3</u> of this RSA, all of the terms of the Agreement, including all Exhibits, Schedules and other documents incorporated into the Agreement, are incorporated into this RSA (these terms, the "**Incorporated Terms**").

    1.2   <u>Amendments to the Agreement</u>. All amendments to the Agreement (each, an "**Amendment**") will apply to this RSA unless the Amendment states otherwise. If either party objects to an Amendment (or applicable portions of the Amendment) applying to this RSA, the objecting party must raise the objection to the other party within 5 business days after the Amendment is executed, in which case the parties will resolve the issue and amend this RSA accordingly. If neither party objects to an Amendment (or applicable portions of an Amendment) applying to this RSA within the 5-business day window, then the Amendment will amend this RSA, and each party waives any defence of unenforceability, lack of power or lack of authority.

2. **Additional and Replacement Terms:  SSA and General Definitions.**

    2.1   <u>Parties</u>. References to "Stripe" and "User" in the Incorporated Terms mean Stripe Affiliate and User Affiliate, respectively. References to the "parties" in the Incorporated Terms mean the parties to this RSA.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

2.2   <u>Agreement</u>. References to "Agreement" in the Incorporated Terms mean this RSA.

2.3   <u>Effective Date</u>. References to "Effective Date" in the Incorporated Terms mean the RSA Effective Date.

2.4   <u>Governing Law; Jurisdiction; Venue.</u> This section replaces <u>Section 13.1</u> of the SSA (Governing Law; Jurisdiction; Venue).

The laws of [insert] will govern this RSA, without reference to its conflict of law principles to the contrary. Each party irrevocably submits to exclusive personal jurisdiction, and will bring any suit or action under or in connection with this RSA exclusively, in the courts located in [insert], and each party waives all objections to that jurisdiction and venue.

2.5   [insert other additional and replacement terms as applicable]

**3.   Additional and Replacement Terms: Stripe Payments Service Schedule.**

3.1   [insert additional and replacement terms as applicable]

**4.   Termination of the Agreement.** Any termination of the Agreement will not affect this RSA.

**5.   Conflicts.** Any conflict between the terms of this RSA and the Agreement will be resolved in favor of this RSA for purposes of this RSA.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

## EXHIBIT 4 – INSURANCE

1.   **Insurance Coverage.** Stripe will maintain the following insurance coverage during the Term:

    1.1    Workers' compensation insurance in accordance with the Law;

    1.2    Employer's Liability insurance in accordance with Law, but not less than USD$1,000,000 per occurrence;

    1.3    Commercial General liability insurance, with a per occurrence limit of at least USD$1,000,000 and an aggregate limit of at least USD$2,000,000;

    1.4    Professional Liability/Technology Errors and Omissions insurance which includes coverage for professional services, network security, privacy liability, data recovery & business interruption, regulatory defense & penalties, with an aggregate limit of at least USD$10,000,000; and

    1.5    Commercial Crime Insurance, including Employee Dishonesty and Theft, with an aggregate limit of at least USD$5,000,000.

2.   **Evidence of insurance.** Upon User's request, Stripe will provide to User evidence of insurance evidencing the above coverage.

## EXHIBIT 5 – STRIPE DATA SECURITY

| Security Programs and Policies | Stripe maintains and enforces a security program that addresses how Stripe manages security, including the security controls Stripe employs. The security program includes:<br><br>• documented policies that Stripe formally approves, internally publishes, communicates to appropriate personnel and reviews at least annually;<br><br>• documented, clear assignment of responsibility and authority for security program activities;<br><br>• policies covering, as applicable, acceptable computer use, data classification, cryptographic controls, access control, removable media and remote access; and<br><br>• regular testing of the key controls, systems and procedures.<br><br>**Privacy Program.** Stripe maintains and enforces a privacy program and related policies that address how Protected Data is collected, used and shared. |
|---|---|
| **Risk and Asset Management** | Stripe performs risk assessments, and implements and maintains controls for risk identification, analysis, monitoring, reporting and corrective action.<br><br>Stripe maintains and enforces an asset management program that appropriately classifies and controls hardware and software assets throughout their life cycle. |
| **Personnel Education and Controls** | All (a) Stripe employees; and (b) Stripe independent contractors who may have access to data, including those who Process (as defined in the DPA) Protected Data ((a) and (b), collectively "**Personnel**") acknowledge their data security and privacy responsibilities under Stripe's policies.<br><br>For Personnel, Stripe, either itself or through a third party:<br><br>• implements pre-employment background checks and screening;<br><br>• conducts security and privacy training;<br><br>• implements disciplinary processes for violations of data security or privacy requirements; and<br><br>• upon termination or applicable role change, promptly removes or updates Worker access rights and requires the Worker to return or destroy Protected Data.<br><br>**Authentication.** Stripe authenticates each Personnel's identity through appropriate authentication credentials such as strong passwords, token devices or biometrics. |
| **Training and Awareness** | **Annual Security and Privacy Training.** Stripe's employees complete an annual Security and Privacy awareness training on Stripe's data security and confidentiality policies and practices. |
| **Network and Operations Management** | **Policies and Procedures.** Stripe implements policies and procedures for network and operations management. These policies and procedures address hardening, change control, segregation of duties, separation of development and production environments, technical architecture management, network security, malware protection, protection of data in transit and at rest, data integrity, encryption, audit logs and network segregation. |

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

| | |
|---|---|
| | **Vulnerability Assessments.** Stripe performs periodic vulnerability assessments and penetration testing on its systems and applications, including those that Process Protected Data. |
| **Technical Access Controls** | **Access control.** Stripe implements measures to prevent data processing systems from being used by unauthorized persons, including the following measures:<br><br>• user identification and authentication procedures;<br>• ID/password security procedures (special characters, minimum length, change of password), including stronger digital authentication measures based on NIST 800-63B;<br>• automatic blocking (e.g., password or timeout); and<br>• break-in-attempt monitoring.<br><br>**Data access control.** Stripe implements measures to ensure that persons entitled to use a data processing system gain access only to the Protected Data allowed for their access rights, and that Protected Data cannot be read, copied, modified or deleted without authorization, including:<br><br>• internal policies and procedures;<br>• control authorization schemes;<br>• differentiated access rights (profiles, roles, actions and objects);<br>• access monitoring and logging;<br>• access reports;<br>• access procedure;<br>• change procedure; and<br>• deletion procedure. |
| **Physical access controls** | Stripe uses reputable third-party service providers to host its production infrastructure. Stripe relies on these third parties to manage the physical access controls to the data center facilities that they manage. Some of the measures that Stripe's service providers provide to prevent unauthorized persons from gaining physical access to the data processing systems available at premises and facilities (including databases, application servers and related hardware), where Protected Data is Processed, include:<br><br>• physical access control system and program in place at Stripe premises;<br>• 24x7 Global Security Operation Center that monitors physical security systems;<br>• security video and alarm systems;<br>• access control roles and area zones;<br>• access control audit measures;<br>• electronic tracking and management program for keys;<br>• access authorizations process for employees and third parties;<br>• door locking (electrified locks etc.); and<br>• trained uniformed security staff.<br><br>Stripe reviews third-party audit reports to verify that Stripe's service providers maintain appropriate physical access controls for the managed data centers. |

| Availability Controls | Stripe implements measures to ensure the ability to restore the availability and access to Protected Data in a timely manner in the event of a physical or technical incident, including:<br><br>● database replication;<br>● backup procedures;<br>● hardware redundancy; and<br>● a disaster recovery plan. |
|---|---|
| Disclosure Controls | Stripe implements measures to ensure that Protected Data (a) cannot be read, copied, modified or deleted without authorization during electronic transmission, transport or storage on storage media (manual or electronic); and (b) can be verified to which companies or other legal entities Protected Data are disclosed, including logging, transport security and encryption. |
| Entry Controls | Stripe implements measures to monitor whether data have been entered, changed or removed (deleted), and by whom, from data processing systems, including logging and reporting systems, and audit trails and documentation. |
| Separation Controls | Stripe implements measures to ensure that Protected Data collected for different purposes can be Processed separately, including:<br><br>● "least privilege" limitation of access to data by internal service;<br>● segregation of functions (production/testing);<br>● procedures for storage, amendment, deletion, transmission of data for different purposes; and<br>● logical segmentation processes to manage the separation of Protected Data. |
| Certifications and Reports | **PCI Compliance**. To the extent applicable to the Services, Stripe will provide the Services in a manner that is consistent with the highest certification level (PCI Level 1) provided by the PCI-DSS requirements. Stripe's certification is confirmed annually by a qualified security assessor (QSA).<br><br>**SOC Reports**. Stripe maintains Service Organization Controls ("**SOC**") auditing standards for service organizations issued under the AICPA. SOC 1 and 2 reports are produced annually and will be provided upon request.<br><br>Stripe may add standards or certifications at any time. |
| Encryption | Stripe applies data encryption mechanisms at multiple points in Stripe's service to mitigate the risk of unauthorized access to Stripe data at rest and in transit. Access to Stripe cryptographic key materials is restricted to a limited number of authorized Stripe personnel.<br><br>**Encryption in transit.** To protect data in transit, Stripe requires all inbound and outbound data connections to be encrypted using the TLS 1.2 protocol. For data traversing Stripe's internal production networks, Stripe uses mTLS to encrypt connections between production systems. |

DocuSign Envelope ID: D25DF07C-91FC-49E8-8E06-10247245CC21

| | |
|---|---|
| | **Encryption at rest.** To protect data at rest, Stripe uses industry standard encryption (AES 256) to encrypt all production data stored in server infrastructure.<br><br>**Payment Card and Banking Account Data Tokenization.** Payment card and bank numbers are separately encrypted using industry standard encryption (AES-256) at the data level and stored in a separate data vault that is highly restricted. Decryption keys are stored on separate machines. Tokens are generated to support Stripe data processing. |
| **Data Security Incident Management and Notification** | Stripe implements a data security incident management program that addresses how Stripe manages data security incidents, including any loss, theft, misuse unauthorized access, unauthorized disclosure, unauthorized acquisition, destruction or other compromise of Protected Data.<br><br>Stripe will notify impacted Stripe users and regulatory organizations (where applicable) of validated security incidents in a timely manner as required by Law. |
| **Reviews, Audit Reports and Security Questionnaires** | Upon written request, and no more frequently than annually, Stripe will complete a written data security questionnaire of reasonable scope and duration regarding Stripe's business practices and data technology environment in relation to the Processing of Protected Data. Stripe's responses to the security questionnaire are Stripe's confidential data. |
| **System Configuration** | Stripe implements measures for ensuring system configuration, including default configuration measures for internal IT and IT security governance.<br><br>Stripe relies on deployment automation tools to deploy infrastructure and system configuration. These automation tools leverage infrastructure configurations that are managed through code that flows through Stripe's change control processes. Stripe's change management processes require formal code reviews and two-party approvals prior to the release to production.<br><br>Stripe uses monitoring tools to monitor production infrastructure for changes from known configuration baselines. |
| **Data Portability** | The Stripe API enables Stripe users to programmatically access the data stored for transfer, excluding PCI-scoped data. The portability process for PCI data to other PCI-DSS Level 1 compliant payment processors can be found https://stripe.com/docs/security/data-migrations/exports. |
| **Data Retention and Deletion** | Stripe implements and maintains data retention policies and procedures related to Protected Data and reviews these policies and procedures as appropriate. |

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

## STRIPE PAYMENTS SERVICE SCHEDULE – DIRECT

1. **Stripe Payments Services.** This Schedule describes the Stripe Payments Services that Stripe will make available to User.

2. **Payment Methods and Transactions.**

   2.1   <u>Acceptance and Use Requirements</u>. As part of the Stripe Payments Services, User may accept payment from Customers using various Payment Methods by submitting Transactions to Stripe through Stripe Technology. All Payment Methods have specific requirements for their acceptance and use. These requirements may be incorporated into the Stripe API and other Stripe Technology, and may be described in the Documentation, the Payment Method Rules and Payment Method Terms. User must comply with all of these acceptance and use requirements.

   2.2   <u>Payment Method Rules and Payment Method Terms</u>. User's acceptance and use of a Payment Method may be subject to Payment Method Rules, Payment Method Terms, or both. Using the Stripe Payments Services to accept a Payment Method or submit a Transaction constitutes User's acceptance of the applicable Payment Method Rules and Payment Method Terms (if any). Stripe will use reasonable means to notify User of material changes to the Payment Method Terms at the same time Stripe notifies all similarly situated Users. Payment Method Rules and Payment Method Terms are Financial Services Terms for purposes of this Agreement.

   2.3   <u>Transaction Settlement Funds</u>. Stripe will deposit Transaction settlement funds owed to User under this Agreement into the User Bank Account.

   2.4   <u>Payment Method Providers and Payment Method Acquirers</u>. Some Payment Method Providers require that their Payment Methods be accepted only through a Payment Method Acquirer, which may be Stripe, a Stripe Affiliate, or a Financial Partner. Some of these Payment Method Providers, such as Visa and Mastercard, require User to enter into Acquirer Terms, which will (a) identify the Payment Method Acquirer responsible for Transactions using the Payment Method Provider's Payment Method; and (b) establish a direct contractual relationship and terms between User and the Payment Method Acquirer, as the Acquirer Terms further describe. The Acquirer Terms describe when they go into effect as to User. Irrespective of whether Acquirer Terms apply, User's acceptance and use of the Payment Method may also be subject to Payment Method Rules or Payment Method Terms (or both), as <u>Section 2.2</u> of this Schedule describes. Payment Method Providers and Payment Method Acquirers are Financial Partners, and Acquirer Terms are Financial Services Terms, for purposes of this Agreement.

   2.5   <u>American Express Conversion – Only Applicable to the American Express Payment Method</u>. If User's American Express Transaction volume exceeds the applicable threshold amount set by American Express, American Express may convert User to a direct American Express merchant. As a direct American Express merchant, User and American Express will enter into a definitive "American Express Card Acceptance Agreement," which will govern User's acceptance of American Express payment cards, and User and American Express must directly agree to User's pricing and other fees payable for American Express Transaction processing. Stripe will continue to process User's American Express Transactions in accordance with this Agreement, except that Stripe will incorporate the new pricing and fees into the applicable Stripe fees.

2.6 <u>Requirements Imposed by Payment Method Rules</u>. As required by the Payment Method Rules: (a) as between the parties, each party is responsible for the acts and omissions of its employees, contractors and agents; and (b) unless a Payment Method Provider expressly agrees, User does not have the ability to bind a Payment Method Provider to any contract or obligation, and User must not represent that it has that ability.

2.7 <u>Bank Account Verification Information</u>. Stripe may provide User with the ability to verify Customer bank accounts. If Stripe provides this ability and User wishes to verify Customer bank accounts, then Stripe will collect and provide certain Customer bank account information to User, which information is Stripe Data for purposes of this Agreement. User will only use this Stripe Data to verify the Customer bank account in accordance with the applicable Financial Services Terms, and Stripe may retain and process this Stripe Data as the terms of the agreement between Stripe and the Customer allows.

## 3. Processing Transactions.

3.1 <u>Payment Authorization Requests</u>. User must only submit Transactions that its Customers authorize, and only after the applicable goods have been shipped or services provided to the Customer; except, User may submit a Transaction before goods have been shipped or services have been provided to the Customer where the Customer has authorized a Transaction for a partial or full prepayment for goods or services to be provided at a future time, or User has obtained the Customer's consent. User must not proceed with a Transaction if User receives a response declining to authorize the Transaction, or if the Customer's Payment Account Details have expired or are invalid. User must not split payment for a single transaction into multiple Transactions except as the Payment Method Rules, Payment Method Terms and Acquirer Terms expressly permit.

3.2 <u>Funds; Pooled Accounts</u>. User appoints Stripe as its agent for the limited purpose of directing, receiving, holding and settling funds under this Agreement. Notwithstanding the prior sentence, no agency is established for tax purposes. All settlement funds Stripe receives for Transactions are combined with settlement funds held for other users and credited to one or more pooled accounts ("**Pooled Accounts**") at one or more Financial Partners. Once settlement funds are credited to a Pooled Account, the relevant Customer has no further obligation to make payments to User with respect to a Transaction. Stripe will promptly update User's Stripe Account balance to reflect processed Transactions. Stripe will transfer settlement funds for Transactions, net of fees, Disputes, Refunds, Reversals and other amounts owed to Stripe, from the applicable Pooled Account to the User Bank Account within the time period stated in the Payout Schedule, unless a Payout Delay occurs and affects the transfer initiation, or Stripe exercises a right under this Agreement to withhold or delay the transfer. Prior to transferring settlement funds to the User Bank Account, Stripe may invest funds held in the Pooled Accounts as described in <u>Section 4.5</u> of the SSA. User has no rights to any Pooled Account or earnings generated by funds held in any Pooled Account and is not entitled to draw funds from any Pooled Account.

3.3     Subscriptions and Invoicing. If User uses the Services to submit recurring or subscription Transactions, User will inform Customers before submitting the initial Transaction that the relevant Transactions will occur on an ongoing basis and explain the method for cancelling the Customer's recurring billing or subscription. If User uses the Services to issue invoices to Customers, User will ensure that the form and content of the invoices comply with Law and are sufficient to achieve the legal or tax effects that User is trying to achieve.

**4.      Actions Stripe May Take in Processing Transactions.**

4.1     Reconciliation and Responsibility. As between the parties, User is responsible for reviewing its Transaction history for accuracy and completeness, and reconciling its Transaction history with the history of transfers from the Pooled Accounts to the User Bank Account. If User finds an error when User reconciles its Transaction history, Stripe will reasonably cooperate with User to investigate and help correct that error as long as User notifies Stripe of the error within 60 days after the error appears in User's Transaction history. If Stripe finds an error in User's Transaction history, Stripe may correct the error by crediting or debiting the User Bank Account.

4.2     Negative Balances. If the User Stripe Account balance is negative or does not contain funds sufficient to pay amounts that User owes to Stripe or Customers, then Stripe may debit the User Bank Account by the amount necessary to collect, and pay out to Customers if applicable, the amounts User owes.

4.3     Disputes; Refunds; Reversals. Notwithstanding anything to the contrary in this Agreement, User is liable to Stripe for the full amount of all Disputes (unless and until a Dispute is resolved to final disposition in User's favor according to applicable Payment Method Rules), Refunds and Reversals.

(a)     *Disputes.* Stripe may delay or withhold paying out a Transaction amount from settlement funds owed to User under this Agreement if Stripe reasonably believes that a Dispute is likely to occur with respect to that Transaction. Stripe may delay or withhold paying out amounts subject to an actual Dispute until the Payment Method Provider resolves the Dispute.

(b)     *Refunds.* Stripe may refuse to act upon a Refund instruction, or delay executing the instruction, if it would cause a negative balance in User's Stripe Account.

(c)     *Reversals.* Without limiting Stripe's rights under Section 4.4 and 4.5 of this Schedule, Stripe may initiate a Reversal if:

(i)      the Payment Method Provider invalidates the Transaction;

(ii)     User received the settlement funds in error for any reason;

(iii)    User was not authorized to accept the Transaction;

(iv)    User received the settlement funds related to activities that violated this Agreement, Law or Financial Services Terms; or

(v)     a Payment Method Provider or Payment Method Acquirer requires Stripe to do so under the applicable Payment Method Rules.

4.4     <u>Stripe Remedies - General</u>. If Stripe reasonably determines that a Triggering Event has occurred, Stripe may do any or all of the following:

(a)     initiate Reversals;

(b)     delay the payout of settlement funds to the User Bank Account;

(c)     establish, fund and use a Reserve;

(d)     debit the User Bank Account; and

(e)     suspend or terminate User's ability to accept Transactions;

but,

(y)     Stripe may only exercise these remedies for the duration and to the extent as Stripe believes is reasonably necessary, and until User (or the relevant User Group Entity) remediates the underlying risk to Stripe and its Affiliates, Customers and Financial Partners; and

(z)     Stripe may only debit the User Bank Account to the extent necessary to resolve a negative balance in any User Group Entity Stripe Account, collect fees and other amounts owed to Stripe, its Affiliates and Customers, and to fund a Reserve in accordance with <u>Section 4.5</u> of this Schedule.

4.5     <u>Reserve</u>. If Stripe establishes a Reserve, Stripe will notify User of the Reserve terms. Upon notice to User, Stripe may change the Reserve terms (a) if Stripe believes, acting reasonably, that there is, or is likely to be, a material change in the underlying risk presented by the User Group's use of Stripe services; or (b) as a Payment Method Acquirer or Payment Method Provider requires. Stripe may fund the Reserve through any or all of:

(x)     funds User provides upon Stripe's request;

(y)     amounts Stripe owes to User for Transactions that User accepts through the Stripe Payments Services; or

(z)     debiting the User Bank Account.

4.6     <u>Security Interest</u>. User grants Stripe a lien and security interest over User's interest in all Transactions (including future Transactions and all User funds that Stripe possesses or maintains on User's behalf) and any and all rights to receive credits or payments under this Agreement. User will execute all documents Stripe reasonably requests to create, perfect, maintain and enforce this security interest, even if the request is made after User's Stripe Account balance becomes negative.

**5.     Multi-Currency Processing.** Stripe may offer User the ability to have funds settled to the User Bank Account in a currency different from the one in which User accepted payment from a Customer ("**Multi-Currency Processing**"). To use Multi-Currency Processing, User must provide Stripe with a valid bank account for each currency for which User requests settlement, based on the list of available settlement currencies stated in the Documentation. Each of these bank accounts is a User Bank Account for the purposes of this Agreement. If User uses Multi-Currency Processing, Stripe will identify at the time of the Transaction the conversion rate that will apply to the

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

Transaction. In the event of a Refund, the conversion rate that will be used to calculate the Refund will be the rate in effect at the time of the Refund.

6. **Surcharging.** If User imposes a surcharge for accepting a given payment card, it must be limited to the lowest of: (i) User's costs for the use of the payment card; (ii) an amount notified to User by Stripe; and (iii) the maximum amount allowed under Law. If User imposes an additional surcharge or offers a discount to Customers for using a particular payment card, User must inform Customers of this before the Transaction. User will provide a receipt to Customers (at no additional charge) when the Transaction is complete that includes all information required by the Payment Method Rules and Law.

7. **Post-Termination Obligations.**

7.1 <u>Completion of Transactions</u>. After the Term, Stripe will complete Transactions that occurred during the Term as long as Stripe would have completed those Transactions were the Agreement still in place (e.g., Stripe will not complete a Transaction if a Financial Partner prohibits Stripe from doing so).

7.2 <u>Provision of Payment Account Details</u>. If this Agreement terminates for reasons other than User's breach, then within 30 days after the termination date, User may request in writing for Stripe to provide all relevant Payment Account Details to an alternative PCI-DSS Level 1-certified payment processor that User identifies to Stripe. Stripe will provide the Payment Account Details that User is entitled to receive to the named payment processor to the extent commercially reasonable, and Stripe may delay or refuse any request if Stripe believes, acting reasonably and in good faith, that Law or Financial Services Terms do not allow Stripe to provide the Payment Account Details.

7.3 <u>Reserve</u>.  If a Reserve has been funded:

(a) User will notify Stripe upon fulfillment of the final Customer order subject to this Agreement (the date of receipt of such notice being referred to as the "**Final Fulfillment Date**"); and

(b) within 180 days of the Final Fulfillment Date, Stripe will refund all amounts remaining in the Reserve account unless prohibited from doing so by Law.

8. **User Information Updates; User Financial Information.** User must immediately notify Stripe, and provide to Stripe updated User Information, if User experiences or anticipates experiencing a material change in the average time between the initial charge and fulfillment of Customer orders. For purposes of the Agreement, User Financial Information includes (a) refund and shipping policies (if applicable); (b) data on captured but unfulfilled charges; and (c) data on the time between charge capture and fulfillment of Customer orders.

9. **Protected Data.** Payment Account Details are Protected Data for purposes of this Agreement.

10. **PCI-DSS Compliance.** Upon Stripe's request, User will verify that User's implementation of the Services is PCI-DSS compliant, and provide the verification results to Stripe.

11. **Warranties.** User represents as of the Effective Date, and warrants during the Term, that:

(a) User only uses the Payment Methods for bona fide commercial transactions with its Customers; and

(b)      User and its third-party service providers that store, access or transmit Payment Account Details comply with PCI-DSS and PA-DSS, as applicable.

12.    **Indemnification; User Liability.** For the purposes of Section 8.6(c) of the SSA, if a Data Incident results in payment card credentials being disclosed in an unauthorized manner, the Data Incident Costs will include the cost of reissuing affected payment cards. Notwithstanding anything to the contrary in this Agreement (a) User will indemnify Stripe for all non-compliance assessments, penalties, fines and fees Payment Method Providers, Payment Method Acquirers and other Financial Partners charge Stripe to the extent arising out or related to User's use of the Stripe Payments Services in a manner that fails to comply with this Agreement, or any Payment Method Rules, Payment Method Terms or Acquirer Terms; and (b) as between the parties, User is responsible for all losses Stripe and its Affiliates incur due to fraudulent Transactions.

13.    **Force Majeure.** Nothing in Section 13.7 of the SSA will excuse User's liabilities and obligations with respect to Disputes, Refunds and Reversals.

14.    **Definitions.**

(a)      "**Acquirer Terms**" means the terms that a Payment Method Acquirer has specified that apply to that Payment Method Acquirer's services, located on or accessible from the Stripe Legal Page, and which as of the Effective Date are described on that page as "Financial Services Terms".

(b)       "**Dispute**" means an instruction a Customer initiates to reverse or invalidate a processed Transaction (including "chargebacks" and "disputes" as those terms may be used by Payment Method Providers).

(c)      "**Payment Account Details**" means the Payment Method account details for a Customer that PCI-DSS requires to be protected, which may include the Customer's name, and with respect to credit and debit cards, the Customer's account number, card expiration date, and CVV2.

(d)      "**Payment Method**" means a payment method that Stripe accepts as part of the Stripe Payments Services (e.g., a Visa credit card, Klarna).

(e)      "**Payment Method Acquirer**" means an entity that a Payment Method Provider has authorized to (a) submit Transactions at the request of merchants to the Payment Method Provider for authorization and clearing; and (b) receive and remit settlement funds for authorized and cleared Transactions.

(f)      "**Payment Method Provider**" means the provider of a Payment Method (e.g., Visa Inc., Klarna Bank AB).

(g)      "**Payment Method Rules**" means the rules a Payment Method Provider publishes that describe how a Payment Method may be accepted and used (e.g., the rules commonly referred to as the "Visa Rules").

(h)      "**Payment Method Terms**" means terms that apply to User's acceptance and use of a Payment Method, located on or accessible from the Stripe Website, including on the Stripe Legal Page, and which as of the Effective Date are described on that page as "Payment Terms."

(i)     "**Payout Delay**" means a delay to the Payout Schedule caused by (a) the unavailability of a Financial Partner, Governmental Authority, telecommunications provider or internet service provider; (b) incorrect information, such as bank account numbers, provided to Stripe; (c) User equipment, software or other technology; or (d) an event over which Stripe has no reasonable control.

(j)     "**Payout Schedule**," which is available in the Stripe Dashboard, means the number of business days following the Transaction date that it takes for Stripe to initiate the transfer of Transaction settlement funds to the User Bank Account.

(k)     "**Refund**" means an instruction User initiates to provide a full or partial return of funds to a Customer for a processed Transaction.

(l)     "**Reserve**" means funds described as such by Stripe, which Stripe holds as security against liabilities User incurs under this Agreement.

(m)     "**Reversal**" means the reversal of the settlement of funds from a Transaction.

(n)     "**Stripe Payments Services**" means the Services that enable User to accept and refund Customer payments and manage Customer disputes.

(o)     "**Total Processing Volume**" means the total volume of Transactions Stripe processes for User during the Term, less Refunds and Disputes related to those Transactions.

(p)     "**Transaction**" means a Payment Method transaction request initiated via the Stripe Technology through which Stripe is directed to capture funds for or from a payer's associated account with respect to a payment from a Customer to User, and includes the authorization, settlement and if applicable, Disputes, Refunds and Reversals with respect to that Payment Method transaction request.

(q)     "**Triggering Event**" means that a User Group Entity:

    (i)     has a Dispute rate that exceeds 0.5% of Total Processing Volume over any 30-day period;

    (ii)     has a Refund rate that exceeds 8% of Total Processing Volume over any 30-day period;

    (iii)     has a negative Stripe Account balance for more than 5 consecutive days;

    (iv)     experiences a material change in the average time between the initial charge and fulfillment of Customer orders;

    (v)     experiences a material deterioration of its business or financial condition;

    (vi)     is or is likely to become the subject of bankruptcy or insolvency proceedings;

    (vii)     has materially breached, or has caused Stripe to materially breach, this Agreement (or any other Stripe services agreement with Stripe or a Stripe Affiliate) or the Financial Services Terms applicable to the User Group Entity's use of the Services;

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

(viii)   has violated or caused Stripe to violate Law governing User's use of the Services; or

(ix)   experiences a Change of Control.

(r)   "**User Affiliate Reserve**" means funds described as such by Stripe, which Stripe or a Stripe Affiliate holds as security against liabilities a User Affiliate incurs under its agreement with Stripe or a Stripe Affiliate.

(s)   "**User Group**" means User and each User Affiliate that has entered into an agreement with Stripe (or any Stripe Affiliate) under which Stripe or the Stripe Affiliate provides services, and "**User Group Entity**" means an entity that is part of the User Group (including User).

## STRIPE CONNECT SERVICE SCHEDULE – PLATFORM

1.    **Stripe Connect Services.** This Schedule describes the Stripe Connect Services that Stripe will make available to User.

2.    **Overview.**

   2.1    Platform Services. User provides products and services through User's platform ("**Platform Services**") to its users ("**Platform Users**").

   2.2    Stripe Connect Services. Stripe offers, as part of the Stripe API, application programming interfaces to enable User to create and manage Stripe accounts related to User's platform, as described in the Stripe Connect section of the Documentation (these Services, "**Stripe Connect Services**").

   2.3    Use of Stripe Connect Services; Connected Accounts. User may use the Stripe Connect Services to enable Platform Users to use Stripe services in conjunction with the Platform Services. Platform Users become "**Connected Accounts**" under this Agreement once they have:

      (a)    completed the Stripe account application process for use of the applicable Services;

      (b)    received approval from Stripe to use the applicable Services; and

      (c)    except for Connected Accounts that are Payout Recipients (defined in Section 2.4 of this Schedule), entered into the Stripe services agreement that applies to Connected Accounts, which is accessible on the Stripe Legal Page for the Connected Account's jurisdiction ("**Connected Account Agreement**").

   2.4    Payout Recipients. Stripe may enable User to make payouts to third-party recipients via the Stripe Connect Services (the recipients of the payouts, the "**Payout Recipients**"). For the purpose of these payouts, Stripe does not provide any service directly to the Payout Recipients, and the Payout Recipients do not have a contractual or business relationship with Stripe. To the extent Stripe provides payouts to Payout Recipients, it does so on User's behalf. To receive these payouts, Payout Recipients will not enter into a Connected Account Agreement or have access to a Stripe Dashboard, and those concepts, as used in this Schedule, will not apply to Connected Accounts that are Payout Recipients.

   2.5    Activity. Connected Accounts may perform Activity, or User may perform Activity on behalf of a Connected Account, depending on how User integrates the Stripe API into the Platform Services.

   2.6    Definitions Applied to Connected Accounts. Where defined terms are applied to a Connected Account (rather than User) in this Schedule, the relevant definition will be deemed to reference the Connected Account (e.g., when the term Services is applied to a Connected Account it means the Stripe services that Stripe provides to the Connected Account under the Connected Account Agreement, and when the term Disputes is applied to a Connected Account it means Disputes incurred by that Connected Account).

   2.7    SSA Clarifications. User's use of the Stripe Connect Services in accordance with this Schedule does not constitute a resale or distribution of the Services for the purposes of

DocuSign Envelope ID: D25DF07C-91FC-49E8-8E06-10247245CC21

Section 4.4(a) of the SSA. Connected Accounts are not third parties for the purposes of, or eligible to make a Claim under, Section 11 of the SSA.

**3.    Stripe Obligations.**

3.1    Services for Connected Accounts. Connected Accounts may use the Services in accordance with the Connected Account Agreement. Stripe may suspend or stop providing any Services to a Connected Account in accordance with the terms of the Connected Account Agreement. Except for Connected Accounts that are Payout Recipients, Stripe has a direct contractual relationship with each Connected Account under the Connected Account Agreement and will provide the Services directly to each Connected Account. User acknowledges that Connected Accounts may choose to use Stripe services outside of the Connected Accounts' relationship with User.

3.2    Amendments to Connected Account Agreement. For Connected Accounts that do not have access to the Stripe Dashboard, Stripe will notify User if Stripe modifies the relevant Connected Account Agreement. User will notify those Connected Accounts of the modification promptly after User receives the modification notice from Stripe.

3.3    Stripe Payments Services - Instant Payouts. Depending on the respective locations of User and the Connected Accounts, User may be able to offer the Connected Accounts the ability to receive Stripe Payments Services proceeds via accelerated settlement into a bank account linked to a Connected Account's debit card ("**Instant Payout**"). When Instant Payouts is used, Stripe will attempt to settle Stripe Payments Services proceeds within minutes of receiving the payout request. Prior to enabling an Instant Payout, User must determine, using the Stripe API, whether the applicable debit card issuing bank has enabled same-day availability of funds for the debit card. If same-day funds availability is not enabled, User may only activate the Instant Payout if User has clearly and conspicuously disclosed this fact to the Connected Account. User's marketing of the Instant Payout functionality to Connected Accounts must clearly and conspicuously disclose (a) the fees (if any) that User intends to apply for Instant Payouts; and (b) that, for certain recipient banks, some Instant Payouts may not settle within minutes, and instead may take longer to be credited to the relevant bank account.

**4.    User Obligations.**

4.1    Stripe Connect Services Integration and Use. User will integrate the Stripe API and use the Stripe Connect Services in accordance with the Documentation and this Agreement. User will use the Stripe Connect Services and Connected Account Data in accordance with Law and its Platform Agreements. User will clearly and prominently disclose any fees that User may charge to Connected Accounts for the Connected Accounts' use of the Platform Services and, to the extent charged separately, the Services.

4.2    Connected Account and Transactional Risk. User will take all reasonable steps to ensure that Connected Accounts do not use the Services in violation of the Connected Account Agreement or for any activity that is prohibited by Law or this Agreement. User will immediately inform Stripe if it becomes aware that a Connected Account is engaging in any activity that is fraudulent, deceptive or abusive, or in contravention of the Connected Account Agreement, Law or this Agreement. User and Stripe will cooperate to reduce the risk of fraud or other misuse of the Services by sharing relevant information as each party's privacy and legal obligations allow.

DocuSign Envelope ID: D25DF07C-91EC-49E8-8E06-10247245CC21

4.3     Activity. User is responsible for all Activity initiated by User, its representatives, and any person using User's credentials, including User's Stripe Account login and password and User's Stripe API key. Notwithstanding anything to the contrary in this Agreement, where either Stripe or a Connected Account incurs any losses based on unauthorized Activity initiated by User or on User's behalf, as between Stripe and User, User is liable for those losses.

4.4     User's Agreements with Connected Accounts. User's Platform Agreement must explain how User accesses and uses Connected Account Data, and the Activity that User may conduct on the Connected Accounts' behalf via the Stripe Connect Services. The Platform Agreements must also authorize User to perform the Activity, and to share the Connected Account Data with Stripe.

4.5     Limitations. User must not use the Stripe Connect Services to access any Connected Account Data or conduct any Activity, or attempt to do either, for which a Connected Account has not given User express authorization or for which this authorization has been withdrawn.

**5.     Stripe Connect Account Options.**

5.1     Platform Account Options. User may elect to enroll each Platform User as a Standard Account, Express Account, Custom Account or Payout Recipient. User is solely responsible for selecting its enrolment mechanism for Connected Accounts, which may include assisting with creating a Stripe account or integrating an existing Stripe account with the Platform Services. User may be able to prepopulate or provide Connected Account Data during the enrollment process, and Section 10.2(h) of the SSA applies to all Connected Account Data that User prepopulates or provides. Stripe may refuse to create a Stripe account for a Platform User or limit the functionality available to a Platform User until and unless Stripe is satisfied that it has received sufficient information about the Platform User.

5.2     Standard Accounts. This Section 5.2 only applies to Standard Accounts.

(a)     *Enrollment.* For Standard Accounts, User will have access to certain Connected Account Data. Stripe may require User to collect and provide additional Connected Account Data to validate a Standard Account.

(b)     *Data; Termination.* Standard Accounts are responsible for Connected Account Data they provide directly to Stripe as part of the Standard Account enrollment process. A Standard Account may at any time terminate User's ability to conduct Activity on its Stripe account.

5.3     Custom Accounts and Express Accounts. This Section 5.3 only applies to Custom Accounts and Express Accounts.

(a)     *Enrollment.* User must create and manage the Stripe accounts for the Custom Accounts and Express Accounts. User must ensure that Connected Account Data is passed to Stripe as described in the Documentation.

(b)     *Connected Account Agreement for Custom Accounts.* User must ensure that each Custom Account agrees to the Connected Account Agreement prior to using its Stripe account. At Stripe's request, User will provide proof as Stripe requires that

DocuSign Envelope ID: D25DF07G-91FG-49E3-8E06-10247245CC21

these agreements exist and have been entered into between the Custom Accounts and Stripe. Stripe may require User to alter the acceptance process for the Connected Account Agreement if Stripe believes, acting reasonably, that User's existing process does not create a binding agreement between Stripe and each Custom Account.

(c) *Dashboard.* Custom Accounts will not have access to a Stripe Dashboard. Express Accounts may not have access to a Stripe Dashboard, depending on how User integrates the Stripe API into the Platform Services.

(d) *Responsibility for Custom Accounts and Express Accounts.* User is responsible and liable to Stripe for all Activity on Custom Accounts and Express Accounts, whether initiated by User or not, including all Transactions, Disputes, Refunds, Reversals (each as defined in the Stripe Payments Service Schedule), associated fines and any use of the Services in a manner prohibited under this Agreement or the Connected Account Agreement. Stripe may attempt to collect amounts owed from Connected Accounts before Stripe collects these amounts from User. However, User remains jointly and severally liable to Stripe for these amounts, and Stripe may collect these amounts from User in accordance with this Agreement.

**6.    Tax Reporting; Tax Invoicing.**

6.1    <u>Tax Information Reports</u>. Except as Stripe and User may agree in writing, Stripe will not file, and User has sole responsibility and liability for filing, all required tax information returns and reports, including IRS Form 1099, IRS Form 1042-S, and any other similar form (each, a "**Tax Information Report**") that User or a Connected Account is required by Law to file with a taxing authority as a result of Services Stripe provides to User under this Agreement or to Connected Accounts under their Connected Account Agreement. This <u>Section 6.1</u> will not be interpreted to relieve Stripe of its obligation to file Tax Information Reports required by Law that report payments Stripe made to User under this Agreement.

6.2    <u>Indemnity</u>. User will indemnify Stripe from all Taxes, and related interest, penalties and fees (excluding any income, franchise or similar taxes payable with respect to the Stripe fees), if any, imposed on Stripe or its Affiliate as a result of (a) User's failure to timely file any Tax Information Report; or (b) providing Stripe Payments Services to User under this Agreement, or Connected Accounts under their Connected Account Agreements.

6.3    <u>Tax Forms</u>. Stripe may have an obligation to provide certain notices or forms, such as tax invoices, to Connected Accounts. User must ensure that its Platform Agreements enable User to receive these notices and forms on the Connected Accounts' behalf, without Stripe being obliged to directly provide the notices and forms to the Connected Accounts. User must promptly make these notices and forms available to the Connected Accounts in compliance with Law.

6.4    <u>Tax Invoices</u>. With regard to Standard Accounts, Stripe will issue Tax invoices (if applicable) directly to User under this Agreement, directly to Standard Accounts under their Connected Account Agreement, or to both User and the Standard Accounts. With regard to Custom Accounts and Express Accounts, Stripe will issue Tax invoices (if applicable) directly to User only. For the purpose of simplifying the invoicing and payment experience for Custom Accounts and Express Accounts, User and Stripe enter into the arrangement described in this sub-section (which is a "**Subdivision 153-B arrangement**" as described in the A New

DocuSign Envelope ID: D25DF07C-91FC-49E8-8E06-10247245CC21

Tax System (Goods and Services Tax) Act 1999 (Cth) (**"GST Law"**)). User and Stripe agree that, for the purposes of entering into the Subdivision 153-B arrangement set out in the GST Law, User will be treated as making separate supplies for the purposes of the GST Law. When User does so, User will be treated as making supplies to Custom Accounts and Express Accounts, and Stripe will be treated as providing a corresponding supply to User (which will be a taxable supply). The value of this corresponding supply will be 10/11 of the amount that is payable by User to Stripe in respect of the supply User makes to Custom Accounts and Express Accounts. The value referred to in the previous sentence excludes any fees to which User is entitled with respect to supplies made separately to the Subdivision 153-B arrangement. When User makes taxable supplies to Custom Accounts and Express Accounts, User must issue to the Custom Accounts and Express Accounts, in its own name, the tax invoices and adjustment notes relating to those supplies (Stripe will not issue to the third parties any such tax invoices and adjustment notes). The Subdivision 153-B arrangement will only continue to have effect for as long as both User and Stripe are registered for GST purposes. In this Section 6.4, all terms have the meaning given to them by the GST Law.

**7.**    **Data Use.** Each of User and Stripe may use Connected Account Data in accordance with this Agreement and the consent (if any) it obtains from each Connected Account, which consent includes, as to Stripe, consent it received via the Connected Account Agreement.

**8.**    **Restricted Businesses.** User must take reasonable steps to ensure that no Connected Account uses the Services to conduct a Restricted Business or transact with a Restricted Business unless Stripe approves otherwise.

**9.**    **User Liability for Connected Accounts Implemented as Custom Accounts or Express Accounts. Notwithstanding anything to the contrary in this Agreement, User's liability for Custom Accounts and Express Accounts as described in Section 5.3(d) of this Schedule is not limited or excluded, including liability arising out of User's failure to ensure that each Custom Account agreed to the Connected Account Agreement in a legally binding way.**

**10.**    **Definitions**

(a)    "**Activity**" means any action taken on or related to a Connected Account that User or the Connected Account performs, either through the Stripe Dashboard or through the Stripe Connect Services, including communication regarding the Services as related to that Connected Account.

(b)    "**Connected Account Data**" means data about Connected Accounts and Activity, which may include Protected Data and Stripe Data.

(c)    "**Custom Account**" means a Connected Account enrolled as a Custom account, as described in the Stripe Connect section of the Documentation.

(d)    "**Express Account**" means a Connected Account enrolled as an Express account, as described in the Stripe Connect section of the Documentation.

(e)    "**Platform Agreement**" means, collectively, the agreements that User has with each Connected Account, and "**Platform Agreements**" means all of the Platform Agreements that User has entered into with its Connected Accounts.

DocuSign Envelope ID: D25DF07G-91EC-49E8-8E06-10247245CC21

(f)     "**Standard Account**" means a Connected Account enrolled as a Standard account, as described in the Stripe Connect section of the Documentation.